**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiffs,**

v.

**CALIFORNIA TEACHERS ASSOCIATION, Defendant.**

**No. C–80–4568 RFP.**

United States District Court, N. D. California.

Jan. 21, 1982.

Chester F. Relyea, and John M. Rea, E.E. O.C., San Francisco, Cal., for plaintiffs.

Dennis H. Vaughn, and William S. Waldo, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This case presents the difficult question whether an organization which serves both as a union and as a voluntary professional association must comply with the Pregnancy Discrimination Act of Title VII when it offers its members temporary employment disability insurance through a purely voluntary purchase plan. The case comes before us on cross motions for summary judgment on the question of liability. The issue of relief has been bifurcated and is to be tried separately. Order of January 15, 1981.

The California Teachers Association ("CTA") was founded over 115 years ago as a voluntary membership association of teaching professionals for the purpose of promoting educational interests in the State of California. It still serves in that capacity. However, since 1975, when the California legislature, through the enactment of the Rodda Act, Cal.Govt.Code § 3540 *et seq.*, gave California public school teachers the right to join labor organizations and to bargain collectively with public school employers, CTA has taken on a new capacity as a union. As of 1977–78, CTA had exclusive representation rights for 180,000 of the state's 200,000 public school teachers. Of the 180,000 teachers in CTA bargaining units, approximately 150,000 were CTA members; the remainder were free riders.

In order to be a member of CTA and to obtain and participate in its services, it is not necessary to be a member of a local CTA chapter which has a collective bargaining relationship with an education-related employer. CTA has many members employed by school districts and other education-related employers where CTA has no local chapter or has no collective bargaining relationship. Moreover, although many CTA members are, of course, teachers employed by the State of California, an individual need not be employed in order to be a member of CTA and to take advantage of CTA's services as a professional association. For example, certified professional educators on a limited leave of absence from work can be CTA members, as can retired teachers, individuals studying to be teachers, and any persons interested in advancing the cause of public education who do not fall within any other CTA membership classification.

CTA is the policyholder of a group insurance policy issued by Occidental Life Insurance Co. of California ("Occidental"). CTA actively markets this insurance to its members, and polices the insurer's treatment of the teachers who make claims against the insurer. Elected leaders of CTA chapters receive briefing on the insurance plan, and then sell the plan to CTA members. Information regarding each insured member is provided to Occidental by CTA. CTA has also constituted an Advisory Panel on Special and Economic Services, which decides on procedures, policies, and claims with regard to insurance offered through CTA. A teaching member dissatisfied with the insurer's refusal of a claim can enlist the assistance of CTA's Group Insurance Subpanel, which adjudicates insurer-claimant disputes.

In those school districts in which CTA has won exclusive bargaining rights, CTA attempts to negotiate for the school district to pay for the disability insurance plan. In each instance where the disability benefits of the group insurance policy are successfully negotiated, in whole or in part, as an employer-paid benefit, the disability income insurance policy specifically covers pregnancy, childbirth, and related medical conditions. Insurance issued in this manner is not the subject of the present suit.

In those instances where CTA has no collective bargaining agreement with an employer, or where a collective bargaining agreement exists but does not provide for employer-paid disability benefits, CTA members who are currently employed may voluntarily purchase the policy at their own expense. When the policy is thus voluntarily purchased, it excludes from coverage disabilities arising from pregnancy. It is this exclusion of pregnancy-related disabilities which the Equal Employment Opportunity Commission ("EEOC") contends is in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended—specifically, § 701(k), added by the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k).

Sandra Duckert was employed by the Lafayette School District, as an elementary school teacher. While CTA did have a collective bargaining agreement with the Lafayette School District, that agreement made no provision for employer-paid disability income protection insurance. Duckert voluntarily purchased the CTA group salary protection plan in question. Thereafter, she became temporarily disabled due to diabetes complicated by pregnancy and submitted a claim to Occidental under the policy. By letter from W. R. Crooke, dated November 28, 1979, Duckert was advised that, since her policy did not cover benefits for disability due to pregnancy or pregnancy-related conditions, and since her disability was pregnancy-related, no benefits would be released to her. She was then advised of her right to have the denial of benefits reviewed by the CTA Advisory Panel. She filed a request for review and was subsequently informed that the CTA Advisory Panel had upheld the denial of salary benefits.

On May 11, 1980, Duckert's attorney wrote to Ralph Flynn, Executive Director of CTA, demanding payment of Duckert's claim and asserting that the voluntary CTA

insurance plan in question was unlawful under the PDA. In response, on May 19, 1980, Alan Cunningham, Assistant General Counsel for Occidental, agreed to pay the benefits demanded by Duckert on the grounds that supplemental medical information indicated that Duckert's disability was attributable to her diabetic condition rather than her pregnancy. Cunningham enclosed a check for $1,663.63, the total amount claimed by Duckert, including interest. Occidental also agreed to continue benefits throughout Duckert's disability period.

On May 21, 1980, Duckert filed Charge of Discrimination No. 0918011491 with the EEOC, alleging that all female members of CTA who had insurance coverage similar to her own were being discriminated against on the basis of sex in violation of the PDA. Following a fact-finding conference, the EEOC issued a determination that the CTA group salary protection plan did violate the PDA, and invited CTA to participate in settlement discussions. On September 19, 1980, a conciliation meeting was held. CTA's settlement offer was rejected by the EEOC at this time, as it did not provide relief to "deterees"—women deterred from purchasing the insurance policy in question because it failed to include pregnancy disability coverage. On that same date, the EEOC notified CTA that conciliation had failed. The EEOC initiated the present action against CTA on December 22, 1980.

## I. DUTY TO CONCILIATE

We first address CTA's contention that the EEOC's failure to reach a settlement bars it from bringing the present action.

Under Title VII, the EEOC has a statutory duty to conciliate prior to bringing suit.[1]

The courts have interpreted the provisions creating this duty as requiring that the EEOC make a *good faith effort* to achieve conciliation prior to bringing suit. *See EEOC v. Sears, Roebuck & Co.*, 650 F.2d 14, 17–19 (2d Cir. 1981); *EEOC v. Pet, Inc.*, 612 F.2d 1001 (5th Cir. 1980); *EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 182–83 (4th Cir. 1979); *EEOC v. Zia Co.*, 582 F.2d 527, 533 (10th Cir. 1978). There is some disagreement as to the proper role of a district court in determining whether such a good faith effort has been made.

One view is that

a court should not examine the details of the offers and counteroffers between the parties, nor impose its notions of what the agreement should provide, any more than it would if dealing with labor contract negotiations under the Labor Management Relations Act.

*Id.* Under this view, instead of focusing on whether the EEOC should have accepted the offered terms of conciliation, the courts tend simply to inquire whether the EEOC provided an opportunity for the party charged with a violation to confront all the issues during the settlement conferences. *See, e.g., EEOC v. Sears, Roebuck & Co.*, supra, 650 F.2d at 18–19; *EEOC v. Pet, Inc.*, supra.

Under a second approach, the district court is required to determine whether the EEOC was reasonable in rejecting a particular settlement offer. This standard is articulated in *EEOC v. Klingler Electric Corp.*, 636 F.2d 104 (5th Cir. 1981), as follows:

The specific language of Title VII says that the Commission, after its investigation has confirmed reasonable cause to

---

1. Section 706(b) of Title VII, 42 U.S.C. § 2000e–5(b), provides in relevant part:

   If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.

   Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1), states:

   If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, government agency, or political subdivision named in the charge.

believe that the charge is true, "shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e–5(b). In evaluating whether the EEOC has adequately fulfilled this statutory requirement, the fundamental question is the reasonableness and responsiveness of the EEOC's conduct under all the circumstances. *Marshall v. Sun Oil Company* (Delaware), 605 F.2d 1331, 1335–36, 21 FEP Cases 257 (5th Cir. 1979). The EEOC has fulfilled its statutory duty to attempt conciliation if it outlines to the employer the reasonable cause for its belief that Title VII has been violated, offers an opportunity for voluntary compliance, and responds in a reasonable and flexible manner to the reasonable attitudes of the employer. Id. at 1335–39. *EEOC v. Klingler Electric Corp., supra,* 636 F.2d at 107.

■ Although it is unclear which of these two views controls in our jurisdiction, we believe that in the instant case, the EEOC's efforts at conciliation would survive even the stringent inquiry into reasonableness applied in the Fifth Circuit. The EEOC rejected CTA's settlement offer because it did not provide relief for "deterees." In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court held that where a nationwide common carrier of motor freight had discriminated against minority drivers by hiring only whites for higher paying jobs, even minority drivers who had not applied for the jobs might be entitled to relief under Title VII, since they had been deterred from applying for the jobs by the discriminatory practices. *Id.* at 364–67, 97 S.Ct. at 1869–70. In light of this holding, the EEOC was not unreasonable in thinking that judicial relief might be available to women deterred from purchasing insurance from CTA.[2] Thus, the EEOC's failure to accept CTA's settlement offer does not bar the present action.[3]

## II. LIABILITY

Title VII proscribes, *inter alia,* discrimination by an employer, employment agency, or labor organization against any individual because of sex. Section 703 of Title VII, 42 U.S.C. § 2000e–2. In 1978, Congress amended Title VII, adding the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), in order to clarify that for purposes of Title VII, sex discrimination includes discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions. The question in the instant case is whether Title VII precludes CTA from offering to its members, for voluntary purchase and not as part of a collective bargaining agreement, disability insurance which does not comply with the PDA.

It is quite clear that, for present purposes, CTA is neither an employer nor an employment agency. See § 701(b) and (c) of Title VII, 42 U.S.C. § 2000e(b) and (c). Thus, in order for CTA to be liable for unlawful employment practices under Title VII, the EEOC must demonstrate that CTA falls within the third form of entity to which Title VII applies—the labor organization. For purposes of Title VII, "labor organization" is defined as follows:

The term "labor organization" means a labor organization engaged in an industry

---

2. We wish to make clear that we are not ruling at the present time that deterees *are* entitled to relief in the instant case. In accordance with the stipulated agreement to bifurcate the trial, the issue of the scope of relief, if reached, will be tried separately from the current inquiry into the question of liability. We hold only that the EEOC was not unreasonable in thinking it might ultimately obtain relief for deterees by rejecting CTA's settlement offer and proceeding to trial.

3. Even if we were to decide that further conciliation attempts were in order, we would simply stay the proceedings for that purpose. We would not dismiss for lack of jurisdiction, as CTA has suggested we should do. The sufficiency of a conciliation effort by the EEOC does not present a jurisdictional question, so long as a conciliation attempt has been made. *EEOC v. Zia Co., supra,* 582 F.2d at 533; *EEOC v. Sears, Roebuck & Co.,* 504 F.Supp. 241, 262 (N.D.Ill.1980); *EEOC v. North Central Airlines,* 475 F.Supp. 667, 669–70 (D.Minn.1979).

affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint counsel so engaged which is subordinate to a national or international labor organization.

Section 701(d) of Title VII, 42 U.S.C. § 2000e(d).

The EEOC contends that CTA is a labor organization within Title VII because, in its capacity as a teachers' union, it falls within the statutory definition of "any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning . . . terms or conditions of employment . . ." *Id.* CTA counters with the argument that because it serves its members in a dual capacity—as a voluntary professional association and as a union—it is exempt from Title VII when it acts as a voluntary professional association. It claims that the present suit concerns one such instance. This contention is based on

the facts that Duckert's school district did not provide employer-paid disability insurance; Duckert's membership in CTA was voluntary; and Duckert's purchase of the insurance in question was voluntary.

However, before we can reach the question whether CTA was acting as a labor organization when it offered insurance to its members on a voluntary purchase basis, we must decide a threshold question: whether CTA is engaged in an industry affecting commerce. For by the terms of section 701(d), *supra*, CTA cannot be considered a labor organization subject to Title VII unless it is engaged in an industry affecting commerce. CTA contends that even if its challenged actions are those of a labor organization, they are not those of a labor organization engaged in an industry affecting commerce; and so Title VII cannot be constitutionally applied to CTA in this capacity.[4]

In asserting that CTA is a labor organization affecting interstate commerce and is thus subject to Title VII, the EEOC has invoked a "statutory presumption" which purports to bring CTA within the ambit of the Act. This presumption arises from what the EEOC contends is the proper reading of two sections of Title VII.

The first section in question is section 701(e).[5] As applied to CTA, sections

---

4. The EEOC's contention that CTA waived its right to assert this argument by failing to plead it is incorrect. CTA raised the interstate commerce issue as an affirmative defense in its Answer and also addressed it in its response to EEOC Interrogatory No. 34.

5. Section 701(e) of Title VII, 42 U.S.C. § 2000e(e), states in relevant part:

A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended;

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization . . .

701(e)(2), (3) and (4) set forth three alternative tests for determining whether CTA is a "labor organization engaged in an industry affecting commerce."[6] Under each of these three tests, the EEOC must demonstrate that the employees whom CTA represents or seeks to represent are "employees of an employer or employers engaged in an industry affecting commerce." *See* section 701(e)(2), which is incorporated by reference in sections 701(e)(3) and (4). As we have noted, the employees whom CTA represents or seeks to represent are employees of various public school districts in the State of California. The question, then, is whether these school districts are themselves engaged in an industry affecting commerce, so that CTA can be said to represent or seek to represent employees of employers engaged in an industry affecting commerce.

In order to establish that the school districts are engaged in an industry affecting commerce, the EEOC relies upon the interaction of section 701(e) with a second section of Title VII, section 701(h), 42 U.S.C. § 2000e(h). The latter section appears to deem "any governmental industry, business, or entity" to be an "industry affecting commerce." Thus, the EEOC concludes, since CTA represents or seeks to represent employees of a government entity which, by virtue of section 701(h) is deemed to be an industry affecting commerce, CTA is *also* an industry affecting commerce, through section 701(e).

It is true that, through the combined effect of sections 701(e)(2)–(4) and section 701(h), Congress appears to have determined that a class of intrastate activities—the activities of labor organizations which represent or seek to represent government employees—affects interstate commerce. The Supreme Court has stated that "[i]n passing on the validity of legislation of . . . [such a class of intrastate activities], the only function of courts is to determine whether the particular activity regulated or prohibited is within the reach of the federal

power." *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 460–61, 85 L.Ed. 609 (1941) (*citations omitted*). In making this judicial determination, the traditional route is to look to the legislative history of the challenged statute in order to ascertain whether Congress "had a rational basis for finding that . . . [the class of intrastate activity in question has] a direct and adverse effect on the free flow of interstate commerce." *Katzenbach v. McClung*, 379 U.S. 294, 304, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964). *See also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). If such a rational basis existed, the class of activities in question can be regulated without the need for individual showings that each activity challenged under the statute affects interstate commerce. Thus, in order to determine whether a rational basis existed for finding that governmental entities are engaged in an industry affecting commerce, we turn to the legislative history of section 701(h).

Section 701(h) originally read:

The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959.

In 1972, Congress amended section 701(h), adding "and further includes any governmental industry, business, or activity" following "Labor Management Reporting and Disclosure Act of 1959." In examining the legislative history of that amendment, it becomes clear that, although the original portion of section 701(h) was undoubtedly enacted under the commerce clause, Congress was *not* exercising its power under the commerce clause when it extended section 701(h) to apply to governmental entities. Instead, Congress was exercising its

---

**6.** As a prerequisite to establishing that CTA falls within any one of the three categories, the EEOC must demonstrate that CTA has fifteen or more members. That CTA does have at least that many members is undisputed.

authority to regulate governmental activity under section 5 of the fourteenth amendment. *City of Rome v. United States*, 446 U.S. 156, 178–80, 100 S.Ct. 1548, 1562–64, 64 L.Ed.2d 119 (1980); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n.9, 96 S.Ct. 2666, 2670 n.9, 49 L.Ed.2d 614 (1976).

This is made apparent in the following analysis of the legislative history of the amendment in question given in *Shawer v. Indiana University of Pennsylvania*, 602 F.2d 1161 (3d Cir. 1979):

> Prior to 1972, state and local governments had not been subject to the Equal Employment Opportunity Act. By 1972, however, Congress felt that:
>
> > The clear intention of the Constitution embodied in the Thirteenth and Fourteenth Amendments, is to prohibit all forms of discrimination.
> >
> > Legislation to implement this aspect of the Fourteenth Amendment is long overdue, and the committee believes that an appropriate remedy has been fashioned in the bill. Inclusion of state and local employees among those enjoying the protection of Title VII provides an alternate administrative remedy to the existing prohibition against discrimination perpetuated "under color of state law" as embodied in the Civil Rights Act of 1871, 42 U.S.C. § 1983.
>
> H.R.Rep.No.238, 92d Cong., 1st Sess. 19 (1971), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2137, 2154.
>
> Despite the clear expression by Congress that its legislative authority was predicated on the Thirteenth and Fourteenth Amendments, the University claims that in the 1972 Amendments to Title VII Congress was attempting to "regulate state government under the commerce clause, U.S. Constitution Article 1, Section 8, Clause 3." Brief for Appellee at 1.

> .    .    .    .    .

If the University were to be graded for the ingenuity of its argument, it would certainly earn an A. When graded on the substantive merits of its argument,

however, the University flunks. The issue is now foreclosed by the Supreme Court's statement in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n.9, 96 S.Ct. 2666, 2670 n.9, 49 L.Ed.2d 614 (1976), that "[t]here is no dispute that in enacting the 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment." Moreover, the legislative history of the Equal Employment Opportunity Act of 1972 demonstrates clearly that the inclusion of state and local government employees was effected pursuant to Section 5 of the Fourteenth Amendment. We have previously quoted the House Report. The Senate Report is equally emphatic with language prophetically tailored to the instant case:

> The Constitution is imperative in its prohibition of discrimination by State and local governments. The Fourteenth Amendment guarantees equal treatment of all citizens by States and their political subdivisions, and the Supreme Court has reinforced this directive by holding that State action which denies equal protection of the laws to any person, even if only indirectly, is in violation of the Fourteenth Amendment. It is clear that the guarantee of equal protection must also extend to such direct action as discriminatory employment practices.
>
> The Committee believes that it is an injustice to provide employees in the private sector with the assistance of an agency of the Federal Government in redressing their grievances while at the same time denying assistance similar to State and local government employees. The last sentence of the Fourteenth Amendment, enabling Congress to enforce the Amendment's guarantees by appropriate legislation is frequently overlooked, and the plain meaning of the Constitution allowed to lapse. The inclusion of State and local government employees within the jurisdiction of Title VII guarantees and protections will fulfill the Congressional duty to enact

the "appropriate legislation" to insure that all citizens are treated equally in this country. (footnotes omitted).

S.Rep.No.415, 92d Cong., 1st Sess. 10–11 (1971).

It is therefore clear beyond question that when Congress eliminated the exemption in Title VII for the employment practices of educational institutions and extended Title VII to state governments, it did so pursuant to Section 5 of the Fourteenth Amendment . . .

*Shawer v. Indiana University of Pennsylvania, supra,* 602 F.2d at 1163–64. *See also United States v. City of Milwaukee,* 395 F.Supp. 725, 727–28 (E.D.Wis.1975).

■ The fact that Congress chose to add the 1972 amendment to a section of Title VII which was enacted under the commerce clause has unfortunately created some confusion as to the congressional intent behind the amendment itself. However, we agree with the Third Circuit in *Shawer* that the misplacing of the amendment in a section of the Act grounded in the commerce clause cannot overcome the fact that, in amending the section, Congress did not analyze the effect of governmental employment practices on interstate commerce. Instead, it directed its attention solely to its authority to regulate governmental activities under section 5 of the fourteenth amendment. Consequently, we need not reach the question whether Congress had a rational basis for finding that the employment practices of governmental entities have an adverse effect on the free flow of commerce. Congress did *not* so find.

■ Because Congress gave no thought to the commerce clause when it amended section 701(h), the portion of section 701(h) in question can only be used as a basis for bringing *governmental* entities within the reach of Title VII. Congress does have proper authority to so regulate governmental entities under section 5 of the fourteenth amendment. Section 701(h) cannot, however, be used as a means of bootstrapping within the reach of Title VII *private* entities such as labor organizations which merely represent or seek to represent employees of governmental entities. Congress can only regulate private parties through the commerce clause under Title VII. Although sections 701(e)(2)–(4) do appear to allow an automatic finding that a labor organization which represents or seeks to represent government employees is engaged in an industry affecting commerce, the purportedly automatic operation of those subsections is based upon an assumption that Congress deemed every government entity to be an industry affecting commerce. We have seen that this assumption is false. Accordingly, we hold that CTA cannot be deemed to be engaged in an industry affecting commerce and thus subject to Title VII merely by virtue of the fact that it represents employees of a state governmental entity.

■ The burden of proving the requisite nexus with interstate commerce is upon the EEOC. *See Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co.,* 469 F.2d 416, 418 (5th Cir. 1972) ("Generally, a plaintiff's allegations of jurisdiction are sufficient, but when they are questioned, as in this case, the burden is on the plaintiff to prove jurisdiction.") *See also McNutt v. General Motors Acceptance Co.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936). The EEOC has not conducted discovery on the commerce question because it assumed that the statutory presumption discussed above obviated the need for an individualized showing of effect upon interstate commerce. Now, the EEOC seeks to offer certain items already in the record as proof that CTA is engaged in an industry affecting commerce. However, we are not prepared to rule that, on the present record, the EEOC has established a sufficient link between CTA and the flow of interstate commerce. Accordingly, the EEOC's motion for summary judgment is denied.

■ CTA's motion for summary judgment is likewise denied, since the question whether CTA is engaged in an industry affecting interstate commerce cannot be de-

termined on the present record. We are cognizant of CTA's argument that, because the EEOC has failed to meet its burden on the commerce question, CTA's motion for summary judgment should be granted at this time. However, given the novelty of the question before us, we are inclined to rule that the individualized showing of effect upon interstate commerce be required prospectively. Accordingly, we will re-open discovery in order to allow the EEOC to attempt to prove that CTA is engaged in an industry affecting commerce.

The EEOC can seek to prove this through either of two routes. First, the EEOC can attempt to demonstrate that CTA is *itself* an "industry affecting commerce" within the terms of section 701(h) of Title VII, 42 U.S.C. § 2000e(h)—that is, that CTA is an "activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce ..." Alternatively, the EEOC can seek to prove that CTA is "[a] labor organization ... *deemed* to be engaged in an industry affecting commerce" by virtue of the fact that it is "recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce." Section 701(e)(2) of Title VII, 42 U.S.C. § 2000e(e)(2) (emphasis added). *See also* §§ 701(e)(3) and (4). In order to make this latter showing, the EEOC would be required to demonstrate that the *employers* of CTA members—that is, the school districts in question—are engaged in an industry affecting commerce. If the EEOC selects this second route, the court requests additional briefing on the question whether the California school districts can be held to be in commerce consistently with *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

Counsel has asked us to indicate the applicable standard for determining whether an entity has sufficient involvement with interstate commerce under Title VII. We have located no cases articulating a mini-mum impact standard applicable under Title VII. However, Title VII and the National Labor Relations Act are closely related and contain similar definitions of the terms "commerce" and "industry affecting commerce." Compare 42 U.S.C. § 2000e(g)–(h) *with* 29 U.S.C. §§ 152(6) and (7) *and* 29 U.S.C. §§ 402(a) and (c). Consequently, it is appropriate to turn for guidance to the cases which establish a minimum impact test under the latter Act. *Cf. EEOC v. Rinella & Rinella*, 401 F.Supp. 175, 181–82 (N.D.Ill.1975). *See, e.g., NLRB v. Living and Learning Centers, Inc.*, 652 F.2d 209 (1st Cir. 1981); *NLRB v. Maxwell*, 637 F.2d 698, 703–04 (9th Cir. 1981); *Von Solbrig Hospital, Inc. v. NLRB*, 465 F.2d 173, 174 (7th Cir. 1972); *NLRB v. Inglewood Park Cemetery Ass'n*, 355 F.2d 448 (9th Cir. 1966), *cert. denied sub nom. First Congregational Church v. NLRB*, 384 U.S. 951, 86 S.Ct. 1572, 16 L.Ed.2d 548 (1966).

Because it is not yet clear whether CTA is engaged in an industry affecting commerce and thus subject to Title VII, at the present time we do not reach the question whether, in offering the challenged insurance, CTA was acting in the capacity of a labor organization; or the question whether the specific act of offering the insurance constituted an unlawful practice within the meaning of Title VII. The parties may renew their motions relating to these questions at a later date, if appropriate.

Discovery is hereby re-opened on the interstate commerce question.

SO ORDERED.