896 F.Supp. 260 (1995)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
and
Mary T. Hodge, Plaintiff-Intervenor,
v.
REGENCY ARCHITECTURAL METALS CORP., Ram Acquisition, Inc. aka Regency Architectural Metals, Inc., International Association of Bridge, Structural & Ornamental Ironworkers, and Shopmen's Local 832, Defendants.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
SHOPMEN'S LOCAL 832 OF the INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL & ORNAMENTAL IRONWORKERS, Defendant.
Nos. 3-87-CV-98 (GLG), 3-88-CV-88 (GLG).
United States District Court, D. Connecticut.
August 8, 1995.
*261 *262 Equal Employment Opportunity Commission, New York City by Deborah Reik and Anna M. Stathis, for plaintiff.
Mary Therese Terris, Niantic, CT, plaintiff intervenor pro se.
Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, CA by Sandra Rae Benson and Zolot & Rosenberg, Woodbridge, CT by Burton S. Rosenberg, for defendant International Association of Bridge, Structural and Ornamental Ironworkers.
Gagne & Associates, Wethersfield, CT by Gregory C. Norsigian, for defendant Shopmen's Local 832.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
GOETTEL, District Judge:
In April, 1987, plaintiff Equal Employment Opportunity Commission ("EEOC") and plaintiff-intervenor Mary T. Hodge[1] commenced *263 this action, seeking injunctive relief and back pay for alleged acts of sex discrimination in violation of Title VII, 42 U.S.C. § 2000e et seq. Plaintiffs' amended complaint has three separate claims. First, plaintiffs allege that Hodge's employer, defendant Regency Architectural Metals Corp. ("Regency"), knowingly assigned a male employee who was awaiting trial for allegedly raping Hodge to work beside her on two occasions, leading her to quit her employment. Plaintiffs also bring this claim against Regency's successor, defendant RAM Acquisition, Inc. ("RAM"). Second, plaintiffs allege that Hodge's union, Shopmen's Local Union No. 832 of the International Association of Bridge, Structural and Ornamental Iron Workers ("Local 832" or "the Local"), failed to represent Hodge in her efforts to challenge Regency's acts of alleged sexual harassment. Third, plaintiffs allege that the International Association of Bridge, Structural and Ornamental Iron Workers ("the International"), denied Hodge representation in her efforts to bring union charges against three members of Local 832, including the alleged rapist.
In February 1988, the EEOC filed a complaint against Local 832, alleging that James Hill, a Local 832 official, was discharged from his union position in retaliation for having helped Hodge obtain signatures for a petition requesting a union trial against another Local 832 official. This action was consolidated with the EEOC's action on behalf of Hodge in August 1989.
In January 1990, RAM made a motion to dismiss, and in August 1991, the International moved for summary judgment. The motions went undecided for several years, due to the many vacancies in the District of Connecticut in the early nineties. In fact, RAM's motion to dismiss outlasted the company itself, which went bankrupt (as had its predecessor, Regency). The plaintiffs are no longer pressing their claims against Regency and RAM, and accordingly, we do not consider Hodge's claims against her former employers.
On December 27, 1994, this case was transferred to the undersigned. On March 7, 1995, we denied the International's motion for summary judgment. A three day bench trial was held beginning on June 20, 1995.

Preliminary Legal Issues
Before giving our findings of fact and conclusions of law, we will rule on several issues raised at the trial. First, we requested at trial, and have received, briefs concerning the weight to be given the EEOC's reasonable cause determinations against Regency (Plaintiffs' exh. 48) and the Local and International (Plaintiffs' exh. 49). The general rule is that the admissibility of EEOC reasonable cause determinations is within the discretion of the trial court, depending on the probative value of the information in the determination and the problems of the inability of defendants to cross-examine the report, and the hearsay it may contain. See Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309 (8th Cir.), cert. denied, 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984).
We conclude that the EEOC's determinations will receive no weight. They consist largely of brief factual assertions which were the subject of testimony at the trial, and legal reasoning, which is the province of the court. Further, there was no foundation from plaintiffs as to how the information in the determinations was compiled.
Another evidentiary issue raised at the trial concerned the admissibility of portions of the deposition of Victor Van Bourg, who was the International's general counsel at the time of the incidents in question. (The deposition was accepted under Federal Rule of Civil Procedure 32(a)(3)(B) because Van Bourg was more than a hundred miles from Bridgeport.) The EEOC argued that many sections of his answers at the deposition were unresponsive to the specific question asked, and were instead self-serving monologues. We agree, and accordingly will not give any weight to the portions of Van Bourg's deposition transcript specified in the EEOC's post trial brief.
The EEOC also objected to the Van Bourg deposition on the ground that Von Bourg had *264 been admitted pro hac vice on behalf of the International while also being a potential witness. Since Von Bourg did not in fact appear for the International at the trial, and since the EEOC did not spell out the specific harm it feared, this objection is overruled.
After plaintiffs rested, the International (seconded by the Local) moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c), arguing that the plaintiffs had failed to offer evidence that a timely charge was filed with the EEOC. We agree with plaintiffs that this issue was settled by our March 7, 1995 decision on the International's earlier summary judgment motion, in which we found that Hodge had filed a timely charge with the EEOC.

Findings of Fact
Hodge began working at Regency, a corporation located in Hamden, Connecticut, in December 1981, as a fourth class ironworker. Her relationship with Local 832's business agent, Robert Seravalli, got off to a bad start when he told her she had to switch her union affiliation to the Ironworkers. She reluctantly did so, but told Seravalli she would campaign against him at the next election for union officers.
While Hodge worked at Regency, there were only a handful of female workers  less than five  out of the total of about thirty-five to forty workers. The atmosphere in the shop was coarse, with much sexually explicit talk among the male workers. Occasionally sexually explicit behavior was directed at the female workers, and at other times it was done with no attempt to hide it from the female workers.
Michael Shanklin, who worked at Regency from November of 1982 through March of 1984 and described himself as a acquaintance of Hodge's, described several such instances. In one, union members Tom Hoffman, Keith Dyson and James Jackson fashioned imitation penises out of styrofoam, stuck them in their groin area, and paraded around the shop. At other times, these three also performed their penis act with extendable tape measures. Keith Dyson and a few other union members, whose names Shanklin couldn't remember, would stick out their tongues at female workers "like they wanted oral sex." Hoffman and other members would also sometimes drop their pants and moon their co-workers. Shanklin observed that these acts were upsetting to the female workers. Dyson and Hoffman were shop stewards, and Dyson was also a union trustee.
Additional evidence for the sexually harassing nature of the Regency workplace comes from a letter written by Grace Hulford, who worked at Regency from 1981 to 1984. Hulford and Hodge were acquaintances. Hulford sent the letter to Hodge in May 1984, after hearing about Hodge's problems. As a partial explanation for why she left her job, she wrote "I could not handle all the jerks and their filthy mouths. They had nude pictures of women in their clipboards.... R.A.M. was definitely not a nice place for a lady to work and never will be." Hulford also testified about these matters. Shanklin and Hulford's testimony was credible, and was not controverted by defendants.
Over the Labor Day weekend, in 1982, Hodge attended a party, at which she was allegedly taken from the party and raped by two men. Charles Vaughn, a co-worker and union brother, allegedly went to where they had plaintiff and also raped her. All three men pleaded nolo contendere to fourth degree sexual assault, which is sexual contact without consent, in November 1983. Per their plea agreement, they each received a suspended sentence of six months, a year's probation, and psychiatric evaluation and treatment "if deemed necessary." Hodge wanted to press the rape charges, but she reluctantly accepted the prosecutor's judgment that the plea agreement was a reasonable one.
Hodge stayed away from work for eleven weeks following this incident, receiving total disability payments from her union health plan. She was afraid to return to work at first, in part because Vaughn was released on bond, and still working at Regency. She sought and received assurances from management at Regency that she could press charges and still have her job back, when she was ready. Seravalli was less helpful to *265 her  he told her that there was some sentiment among her co-workers that she had been drunk at the time of the alleged rape, and that her sexual habits were generally loose. Seravalli also suggested she might not want to return to work right away. Feeling that the Local was not entirely sympathetic, Hodge wrote a letter on November 3, 1982 to James Edward Cole, an assistant to Juel D. Drake, the International's General Secretary, outlining her situation and asking vaguely for protection.
On November 11, 1982, Hodge returned to work at Regency. Regency's position was that they would try to keep Hodge and Vaughn separate, but that some close proximity was unavoidable, in light of the limited work area, and would have to be endured. On January 4, 1983, Hodge's and Vaughn's work assignments were such that they were working in close proximity for short periods of time. Hodge was very upset by this, and stayed home, sick, for the next three days.
On January 11, 1983, back at work, she tried to get Seravalli to help her persuade Regency to keep her separate from Vaughn. Seravalli did look into the situation, and informally requested Regency's management to keep Hodge and Vaughn separated, but the grievance procedure was not otherwise utilized. The grievance procedure is spelled out by the Agreement:
Should a grievance or work dispute arise between the Company and an employee(s), an earnest effort shall be made to settle such grievance or dispute in the following manner:
Step 1. By the complaining employee(s), Shop Steward, and Foreman of the Department. If not settled, the grievance or dispute shall be processed as provided for in Step 2.
Step 2. By the Shop Committee and a designated representative(s) of the Company. If not settled, the grievance or dispute shall be processed as provided for in Step 3.
Step 3. By a representative of the Union, the Shop Committee, and a designated representative(s) of the Company. The Company's representative shall render a decision, in writing, within three (3) days....
. . . . .
In the event a grievance or dispute between the Company and an employee(s) is not settled as provided for in Step 1 above, the grievance or dispute shall be reduced to writing, on forms furnished by the Company, and approved by the Union, and signed by the aggrieved employee or the Departmental or Chief Shop Steward, and shall be taken up on some one day of each week to be mutually agreed upon.
In a letter to the EEOC on April 3, 1984, Seravalli confirmed that Hodge asked him to file a grievance on her behalf after she had been assigned to work near Vaughn. Seravalli states in the letter that after investigating the situation, he concluded that no grievance was justified because of the company's right to assign work under Section 6 Subsection A of the Agreement. (This section does give the employer power over work assignment, but says that this power cannot be used to improperly discriminate.)
At trial, Seravalli provided two additional explanations for why the grievance procedure was not fully utilized on Hodge's behalf. He testified that when Hodge asked him to file a grievance, he told her that if she put it in writing, he would process it. She never did reduce her grievance to writing. He also testified that the chief shop steward or members of the shop committee are the people who normally conduct the first, oral stage of a grievance, not the business agent.
On January 18, 1983, Vaughn's and Hodge's work assignments again were such that they had to spend short periods in close proximity. When Hodge complained to David Allen, a Regency official, he told her that the situation was unavoidable, and that she should leave her problems outside the plant and get her head screwed on straight. This time Hodge quit the job for good.
Regency challenged Hodge's claim for unemployment benefits, arguing that she had quit voluntarily. On April 18, 1983, a Connecticut Appeals Referee decided that Regency had offered Hodge no reasonable alternative to leaving work, and upheld her *266 unemployment benefits. One week later, Hodge forwarded a copy of the decision to John Lyons, the International's General President, asking what the International's position was on what had happened to her, and whether they would do anything about it. Lyons wrote back that there was little the union could do if she had quit without filing a grievance.
Hodge had also written to Lyons earlier, leading the International to investigate her complaint. In a letter to Lyons, dated February 1, 1983, Hodge requested "protection," and help in getting her job back. In a letter signed by Juel D. Drake, the General Secretary of the International, and dated February 24, 1983, the International told her they were sending a representative to investigate her complaint.
On March 8 and 9, District Representative John Sciandra of the International investigated the situation by touring the shop and interviewing Hodge, Seravalli, and three Regency officials. He wrote up his findings in a letter to Drake dated March 12, 1983, in which he concluded that neither the Local nor the company had done anything wrong.
Sciandra was the only member of the International at the time of the incidents at issue who testified at the trial (the other major players in the International having passed away). Judging from Sciandra's testimony, the International's attitude towards Hodge was somewhat patronizing, as if she were an exasperating and possibly delusional child who complained too much.
On May 11, 1983, Hodge sent another letter to Lyons informing him that she had reluctantly decided to bring union charges against Vaughn, James Jackson (another union member and co-worker who had been involved in earlier sexual harassment), and Seravalli. In her charges, Hodge cited numerous provisions of the International's constitution, including Article XIX, § 10, which provides that "[c]harges may be preferred against any Local Union, officer or member of the [International Association of Bridge, Structural and Ornamental Iron Workers] for the commission of any one or more of the following offenses: ... 4. Defrauding, slandering or otherwise wronging a member of the Association."
Hodge's charge against Vaughn complained of the rape, and added: "Further, after his arrest and in the interim of trial his false statements incited and fostered Union brothers to act in a dishonorable manner resulting in charges being brought against Union brothers." Hodge's charge against Jackson was as follows:
Upon my return to work J.J. accused me of calling him racial names in an effort to have me chasti[s]ed and fired before C.D. Vaughn's return. He further subjected me to name calling and continu[]al harassment and set ups to have me fired or chasti[s]ed. He refused a direct order from a[n] Assi[s]tant foreman to move a piece of material with me stating "he would do nothing that helped the Bitch[.]" He further chased me down Dixwell Ave, Hamden with his car call[]ing me names and almost caused an accident in my attempt to get away from him and his passenger. He did not protect me and slandered me on my job per our Union Oath.
We find that in the context of the facts of this case, Hodge's charges against Vaughn and Jackson should be taken to allege harassment on account of sex. Hodge's charge against Seravalli accused him of slandering and discrediting her, and failing to protect her from Vaughn.
The International's response to Hodge's charges was not helpful to her. On September 20, 1983, Drake sent three letters to Richard Dolan, the President of Local 832, one for each charge. As to Vaughn, Drake wrote: "The allegations contained in the charges preferred by Sister Hodge against Brother Vaughn do not relate to union activities or the Constitution of this International Association. Therefore, these charges should not be entertained." As to Jackson, Drake wrote:
The allegations contained in these charges accuse Brother Jackson of slander and defamation of character. The National Labor Relations Board has taken the position that any member has the right to say anything about any other member that they wish and charges may not be brought *267 by one member against another for slander or defamation of character. The only remedy a member who has been defamed or slandered has is at civil law. Therefore, these charges should not be processed further.
As to Seravalli, Drake wrote: "It should be noted that in accordance with Article XXVI, Section 14, Paragraph 6 of the International Constitution it will be necessary that these charges be signed by fifteen members in good standing before they are processed further."
On September 29, 1983, Dolan sent three letters to Hodge, informing her that "as per instructions" received from General Secretary Drake, 1) Local 832 would not process further her charges against Vaughn and Jackson, and 2) she would have to get fifteen signatures from members of Local 832 in order to proceed against Seravalli.
Union charges are tried by the local unions, with the International acting as an appellate body. The International offered evidence at trial that in sending the letters to Local 832 concerning Hodge's charges, the International was simply notifying the Local that it considered Hodge's charges against Jackson and Vaughn to be beyond the union's jurisdiction.
However, the International was not convincing on this point. While we can certainly see valid reasons why the union would not want to allow Hodge to press her complaint of rape through the union while the criminal matter was still pending, Hodge's charge against Vaughn went beyond the rape in alleging that Vaughn made false statements that incited union members against her. This activity would seem to fall within the constitutional provision allowing charges to be brought for "[d]efrauding, slandering or otherwise wronging a member of the Association." In light of this, the International's position that Hodge's charge against Vaughn did not relate to union activities, or fall within the language of the constitution, falls flat.
The International's stated justification for rejecting Hodge's charge against Jackson is similarly unconvincing. Hodge's charge against Jackson alleges on the job harassment. The International characterizes the charge as involving only slander (which is an unreasonably narrow reading of the charge), and states that the National Labor Relations Board has determined that union members cannot bring such charges against one another through the union. However, the only authority for such a limitation offered by the International were federal decisions interpreting the free speech clause of the Labor Bill of Rights, 29 U.S.C. § 411(a)(2). These decisions simply stated that union members could not be retaliated against through the union for their political activities and beliefs. See Petramale v. Local 17 of Laborers Int'l Union, 736 F.2d 13 (2d Cir.), cert. denied, 469 U.S. 1087, 105 S.Ct. 593, 83 L.Ed.2d 702 (1984); Rollison v. Hotel Employees Local 879, AFL-CIO, 677 F.2d 741 (9th Cir.1982); Stachan v. Weber, 535 F.2d 1202 (9th Cir. 1976). These decisions have nothing to do with a male union member allegedly harassing a female co-worker because of an allegation of rape she has brought against another union member. In short, the International's stated reasons for opposing Hodge's charge against Jackson are not sufficient.
On the other hand, there is nothing suspicious about the International's statement that Hodge would have to obtain fifteen signatures to proceed against Seravalli, because this requirement is set forth in the International's constitution at Article XXVI, § 14, ¶ 6. Hodge did in fact obtain the needed signatures in October 1983, although none of them came from the union members at her former workplace. Rather, they came from members of Local 832 who worked for Thames Valley Steel in New London, where Hodge's petition was circulated by the chief shop steward, James Hill. In August 1984, Seravalli removed Hill from his position as chief shop steward.
Seravalli testified that he removed Hill because of the many complaints about him from workers at Thames Valley; Hill contends that Seravalli was retaliating against him for having supported Hodge's charge. Both of these explanations are too simple, because they ignore the fact that there had been bad blood between Hill and Seravalli *268 for many years before the circulation of the petition. Hill had run against Seravalli for the position of business agent more than once, and lost each time. Also, in 1978 he sent a letter to the International alleging that Seravalli had committed certain misdeeds.
Considering all the evidence, we find that Hill's support of Hodge was not a motivating factor in Seravalli's decision to remove him from his position as chief shop steward. Rather, the motivating factors were the enmity between the two men, and problems with Hill's performance in his position.
Even after Hodge had obtained sufficient signatures to go forward with her charge against Seravalli, no union trial was ever held. Seravalli testified that he believed that the International had investigated her charge against him and concluded that it did not merit a trial. However, counsel for the International established that the basis for this belief of Seravalli's was the three letters sent from the International to the Local commenting on each of Hodge's charges, which merely said that Hodge had to obtain fifteen signatures to proceed against Seravalli. There was no further testimony as to why no union trial was held on Hodge's charge against Seravalli. It appears that the Local simply ignored the charge, probably in deference to Seravalli's powerful position, and out of an unwillingness to help Hodge.
Interestingly, in a letter to the EEOC dated April 3, 1984, Seravalli wrote: "Ms. Hodge failed to obtain the requisite number of signatures [for a union trial against him], therefore no trial was set. The Local Union does not have the power to waive any of the provisions of the International Constitution." This self-serving letter was sent many months after Hodge had in fact obtained the necessary signatures. It obviously raises additional questions about Seravalli's credibility.
Counsel for Local 832 have at times advanced the theory that Hodge did not press her grievance against Regency for having to work near Vaughn because she didn't want her sexual relationship with Ed White, who was the President of the Local, to come into the open. This logic behind this argument has never been spelled out, and remains elusive. The argument says more about the Local officials' awareness of Hodge's sexuality than about the legal issues in this case.
As to damages (in the form of back pay) we find as follows. At Regency, Hodge earned $5.50 an hour, making her typical weekly take home pay at most $250, and often less. As to what Hodge earned on her own between her leaving work in January 1983 and November 1987 (when the shop where she had worked went out of business), plaintiffs submitted a "Summary Statement of Earnings" from the "Office of Central Records Operations" in Baltimore, Maryland, showing her social security earnings. There was no individual breakdown for 1983, but the record shows earnings of $352.25 for 1984, $637.04 for 1985, $2,250.04 for 1986, and $668.25 for 1987. The only tax return for these years that plaintiffs produced was for 1987, which echoed the social security report, and indicated that Hodge received welfare that year, in an unspecified amount.
Hodge's testimony about her earnings between 1983 and 1987 was vague. She said she had no financial records from that time, and could not remember how much she had earned from any particular job. In March 1984, she began to work as an independent general contractor, and continued with this work at least through 1987. In that position there was no employer to withhold social security payments from her earnings. She also had a number of other jobs, including waiting on tables (where the income would be primarily from tips) and other service sector jobs.

Conclusions of Law

1. Liability of Local 832
Plaintiffs ground their claim against the Local on Title VII, § 703(c)(1), 42 U.S.C. § 2000e-2(c)(1), which makes it an unlawful practice for a union to "exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin," (emphasis added) and on the interpretation given this language in Goodman v. Lukens Steel Co., 482 U.S. 656, 107 S.Ct. 2617, 96 *269 L.Ed.2d 572 (1987). In Goodman, the Supreme Court specifically affirmed the District Court's holding that:
"A union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under both Title [VII] and § 1981, regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities."
Id. at 669, 107 S.Ct. at 2625 (quoting Goodman v. Lukens Steel Co., 580 F.Supp. 1114, 1160 (E.D.Pa.1984)). This holding applies equally to sex discrimination as to the race discrimination at issue in Goodman.
For the Goodman holding to apply to the instant case, Hodge's grievance against Regency for assigning Vaughn to work near her must state a claim of discrimination on the basis of sex. Plaintiffs assert that Regency's action amounted to the creation of a hostile environment based on sex. It is not necessary to determine whether Regency's action was in fact a Title VII violation, however, since it is sufficient to invoke the Goodman holding that Regency's action gave Hodge a colorable claim of discrimination on the basis of sex. We find that Regency's action did indeed give rise to a colorable claim of having created a hostile environment based on sex.
Certainly, the facts in this case differ from the typical case of sexual harassment that creates a hostile environment, in which "`[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... has the purpose or effect of ... creating an intimidating, hostile, or offensive working environment.'" Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986) (quoting EEOC guidelines). There was no evidence that any official at Regency engaged in any verbal or physical conduct of a sexual nature, or had any intent of making Hodge's working environment unreasonably difficult. However, other factors suggest that Regency might have been liable. First, Regency officials displayed an egregious lack of insight into the psychology of a putative rape victim, especially given that they had ample warning of Hodge's precarious emotional state. Second, their insensitivity did create a hostile working environment for Hodge. We conclude that Regency's marked insensitivity gave rise to a colorable claim of discrimination on the basis of sex.
Having found that Hodge did have a colorable discrimination claim against Regency, we now consider whether the Local (in the person of Seravalli) intentionally avoided asserting her claim, in deference to the perceived desires of its male membership. We conclude that it did.
When Hodge grieved orally to Seravalli about Vaughn having been assigned to work near her on January 4, 1983, he did not make an earnest effort to settle her grievance, as required by the International's constitution. The fact that he has offered contradictory explanations for failing to help her (he investigated and concluded Regency had done no wrong; she refused to put her claim in writing; he was the wrong person to initiate the first step of the grievance process) requires us to look deeper for his actual motivation.
Seravalli's position as business agent was an elected one, and accordingly he had a strong reason to cater to the prejudices of his overwhelmingly male constituency. The evidence has established that the membership of Local 832 at the Regency shop, and by inference, at other Local 832 shops, was shot through with sexist attitudes towards the handful of female workers. We thus conclude that Seravalli's desire to cater to the prejudices of the members of Local 832 was a motivating factor in his failure to adequately assert Hodge's claim against Regency. See Zaken v. Boerer, 964 F.2d 1319, 1324-25 (2d Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 467, 121 L.Ed.2d 375 (1992) (Title VII violation occurs when discriminatory reason plays a "motivating role" in employment decision).
However, we conclude that the Local's failure to hold a union trial on Hodge's charge against Seravalli was not a violation of Title VII. There was little or no useful evidence concerning this omission, but we *270 conclude that the union's motivation in failing to hold the trial was deference to Seravalli's clout, rather than any improper discriminatory motivation.

2. Liability of the International
Having found the Local in violation of Title VII, we next consider the liability of the International. In denying the International's motion for summary judgment, we held that the International could be directly liable under the Goodman court's interpretation of Title VII (we will consider vicarious liability later). Plaintiffs' direct claim against the International differs from their claim against the Local, in that it alleges that the International blocked Hodge's attempt to bring claims against union members, rather than against Regency. Plaintiffs' claim against the International thus does not fit the Goodman fact pattern as well as does plaintiffs' claim against the Local, since in Goodman the union was found to have intentionally avoided asserting workers' statutory discrimination claims against the employer, rather than internal union charges.
This difference is immaterial. The language of Title VII prohibiting discrimination by labor organizations is quite broad ("It shall be an unlawful employment practice for a labor organization  (1) to exclude or expel from its membership, or otherwise discriminate against, any individual because of his ... sex") and thus on its face appears to include plaintiffs' claim against the International. Moreover, this interpretation accords with the overall purpose of Title VII. Title VII is concerned with eliminating discrimination in connection with employment. When a union selectively withholds its internal union disciplinary procedures from women, this has the direct effect of strongly discouraging them from using the union in regard to employment. The end result is that women may receive fewer employment opportunities. We conclude, following Title VII and Goodman, that unions may not restrict female union members' access to internal disciplinary procedures, either out of prejudice on the part of union decision-makers, or in deference to the prejudices of the rank and file.
In this case, the International did take direct action to block Hodge's charges against Jackson and Vaughn by sending letters to the Local stating that these charges could not be brought under the International's constitution and relevant caselaw. (The Local simply told Hodge that it was following the International's "instructions" in taking no further action on her charges.) And we conclude that the International's stated reasons for blocking the charges are unconvincing and pretextual.
However, the plaintiffs have failed to meet their burden of showing by a preponderance of the evidence that a motivating factor for the International's actions was sexual prejudice, or desire to cater to the prejudices of the rank and file. The International did not have the same motivation to cater to the demonstrated prejudices of the rank and file that Seravalli did, as an elected official of Local 832. Instead, the best explanation for the International's obstructionism is that the International simply did not want to give a forum to a person they saw as mentally unstable and somewhat of a troublemaker.
Moreover, we note that the International's interference with internal union action against certain members of the Local was not a proximate cause of Hodge's damages in this case. She had been constructively discharged by her employer many months earlier. The conducting of union charges against union members would not have recaptured her position with Regency.
Plaintiffs also argue that the International is vicariously liable for the Local's failure to assert Hodge's grievance against Regency. An international labor organization is not vicariously liable for an affiliated local's violation of Title VII unless the local was acting as the agent of the international, as determined by traditional common law principles. Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1426-1430 (D.C.Cir.1988), cert. denied, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989). Traditional factors indicating an agency relationship include consent, fiduciary duty, absence of gain or risk to the agent, and control by the principal. Id. at 1429 n. 29.
*271 There simply was no evidence in this case to establish an agency relationship. The International does not generally control the actions of its locals, and while the International can take over a local, this is an extreme and unusual measure. The International is not vicariously liable for Local 832's failure to assert Hodge's grievance against Regency.

3. Back pay
Having found that the Local violated Title VII, we consider the issue of back pay (plaintiffs also requested injunctive relief, but they agree that the bankruptcy of Regency and RAM has mooted this claim). "The purpose of the back pay provision of Title VII is to make victims whole for injuries sustained from past employment discrimination." Rios v. Enterprise Ass'n Steamfitters Local 638, 860 F.2d 1168, 1175 (2d Cir.1988). A claimant under Title VII is required to mitigate damages. Ford Motor Co. v. EEOC, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982). In the words of the statute, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g).
We begin with the premise that the cut off point for recovering back pay is November 1987, when the shop where Hodge was working went out of business. We can also conclude with reasonable certainty, based on her weekly earnings, that Hodge's annual salary at Regency was approximately $16,000. However, our information about Hodge's earnings after leaving Regency is skimpy and unreliable. The problem with the reported social security earnings is that they would not automatically include income Hodge received from her independent contracting work. We conclude that Hodge's earnings between January 1983 and November 1987 averaged $8,000 per year. Thus, we conclude that she is entitled to an average yearly back pay award of $8,000, which, over a period of four years and ten months, gives a total of $38,667.
We will follow other Connecticut district courts that have awarded prejudgment interest on back pay in Title VII cases using the interest rates provided in § 6621 of the Internal Revenue Code. See Maturo v. National Graphics, Inc., 722 F.Supp. 916, 930 (D.Conn.1989); Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport, 572 F.Supp. 494 (D.Conn.1983). The EEOC is directed to submit calculations within ten days of receiving this decision, showing, for each year between 1983 and 1987 (assuming only ten months of back pay in 1987), how much interest has accumulated. The Local has ten days from the receipt of the EEOC's submission to determine whether to object, and if so, to offer an alternative calculation.

4. Retaliation Claim against Local 832
Lastly, we consider the EEOC's claim that the Local removed Hill from his union position in retaliation for his having helped Hodge obtain signatures for her charge against Seravalli. Forty-two U.S.C. § 2000e-3(a) prohibits a labor organization from discriminating against any member "because he has opposed any practice made an unlawful employment practice by this subchapter."
To prevail in a [Title VII] retaliation case, the plaintiff must show that he engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.
Sumner v. U.S. Postal Serv., 899 F.2d 203, 208-09 (2d Cir.1990).
We assume arguendo that Hodge was engaging in a protected practice under Title VII in pressing her internal union charge against Seravalli. However, we conclude that the EEOC has failed to show that retaliation for Hill's support of Hodge was a motivating factor in Seravalli's removal of Hill. Seravalli had other major reasons for removing Hill, including long-standing personal enmity and problems with Hill's leadership. Furthermore, the removal occurred *272 close to a year after Hill had supported Hodge's petition effort. We conclude that the EEOC has failed to support its retaliation claim on behalf of Hill.

Conclusion
For the reasons stated above, we find for the EEOC and Hodge as to their Title VII claim against Local 832, and against the EEOC and Hodge as to their Title VII claim against the International. We find against the EEOC as to its claim on behalf of James Hill against Local 832 (original case number 3-88-CV-88). On the EEOC and Hodge's claim against Local 832, we award back pay in the amount of $38,667, as well as prejudgment interest to be determined later based on additional submissions.
SO ORDERED.
NOTES
[1] The Plaintiff-Intervenor used the name Mary T. Hodge in the amended complaint, but she currently goes by Mary Therese Terris. Since she went by the name of Mary T. Hodge at the time of the incidents in question, we will use that name in this opinion.