Thomas WIRTZ, Plaintiff,

v.

KANSAS FARM BUREAU SERVICES,
INC., Defendant.

No. 01–2436–KGS.

United States District Court,
D. Kansas.

July 23, 2003.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiff.

Deena Hyson Bailey, Teresa L. Mah, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for Defendant.

### MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR DAMAGES

SEBELIUS, United States Magistrate Judge.

This matter comes before the court upon the motion of plaintiff, Thomas Wirtz, for certain damages and costs against the defendant, Kansas Farm Bureau Services, Inc. ("KFBS") (Doc. 115). Defendant filed its Response on July 9, 2003. (Doc. 121). Plaintiff filed a Reply on July 17, 2003. (Doc. 124). For the foregoing reasons, plaintiff's motion is hereby granted in part and denied in part.

### INTRODUCTION

On August 29, 2001, the plaintiff filed a claim under Title VII of the Civil Rights Act of 1964 ("Title VII")[1] against the defendant, alleging gender employment discrimination, sexual harassment/hostile work environment, and retaliation. The case was tried before a jury commencing on June 16, 2003. On June 23, 2003, the jury returned a verdict in favor of plaintiff on the claim of gender discrimination and in favor of defendant on the claims of sexual harassment and retaliation. The jury awarded the plaintiff $1000 in compensatory damages, $12,000 in pecuniary damages, and $20,000 in punitive damages. The jury, sitting in an advisory capacity, declined to award plaintiff any damages for lost wages or lost benefits. The question of future wages was not submitted to the jury.

Plaintiff now requests that the court award certain relief in this matter prior to entry of judgment. In particular, plaintiff prays for the following relief:

1. That the court award plaintiff back pay, consisting of past wages and past benefits;

2. That the court award plaintiff front pay;

3. That the court award plaintiff prejudgment and postjudgment interest;

4. That the court award plaintiff other equitable relief, consisting of reinstatement and posting of notices of defendant's violations of plaintiff's civil rights and other relief; and

5. That the court award plaintiff attorney's fees and costs.

---

1. 42 U.S.C. §§ 2000e et seq.

## DISCUSSION

### A. BACK PAY

■ Plaintiff made a claim in this case for back pay damages from the date of termination until the date of trial. Plaintiff's discovery responses indicate a claim for back wages and benefits in the amount of $104,000. Plaintiff's lost wages and benefits claim in the Pretrial Order was in the amount of $60,000. During trial, plaintiff's counsel represented that plaintiff had lost $10,000 to $12,000 in three months he was out of work and asked the jury to award him that amount in back wages. The jury's advisory verdict for lost wages and lost benefits was zero. Plaintiff now renews his request for $12,000 in lost wages plus $3,000 in lost benefits.

■ Back pay is an equitable remedy available to plaintiffs in Title VII actions. The court has the discretion to award plaintiff back pay if it deems such award necessary to make plaintiff whole.[2] In *Albemarle Paper Co. v. Moody,* the Supreme Court held that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."[3] "A finding of a violation of Title VII presumptively entitles the victim of the discrimination to an award of employment, retroactive pro-

motions and raises, and backpay including lost benefits."[4] While back pay is available to a plaintiff who has been wrongfully terminated, Title VII imposes an obligation on the plaintiff to mitigate damages by seeking other employment.[5]

■ Back pay is designed to compensate the plaintiff for wages lost between the time of termination and the time of trial.[6] If the calculation is performed over the entire time span between termination and trial, it is sometimes termed the "aggregate" method. In cases where the plaintiff was able to find another job prior to the successful resolution of the issues at trial, a "periodic method" of calculating back pay may also be appropriate.[7] In the instant action, plaintiff was, in fact, able to obtain new employment with Venator Group within approximately three months of termination, earning a higher starting salary.

Notwithstanding plaintiff's new employment, plaintiff requested back pay from the date of termination to the date of the trial. Furthermore, both parties submitted and neither party objected to a jury instruction utilizing the aggregate method of lost wage calculation. The court gave the parties an opportunity to reconsider the charge by suggesting an alternative instruction requesting damages for lost wages between the time plaintiff was fired and the time he found a new job at Venator Group, in effect limiting the award to

---

**2.** See *Whatley v. Skaggs Cos.,* 707 F.2d 1129, 1138 (10th Cir.1983) ("title 42 U.S.C. § 2000e–5(g) leaves to the discretion of the trial court the amount of back pay to be awarded a successful plaintiff in an employment discrimination action."); *see also Albert v. Wesley Health Services,* 2001 WL 503241, *2, 2001 U.S. Dist. LEXIS 6119, *6–8 (D.Kan. 2001).

**3.** 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**4.** See *Hillman v. United States Postal Service,* 2002 U.S. Dist. LEXIS 363, *5 (D.Kan.2002), citing *Sanchez v. Philip Morris Inc.,* 774 F.Supp. 626, 629 (W.D.Okla.1991).

**5.** See *Acrey v. American Sheep Inds. Ass'n,* 981 F.2d 1569, 1576 (10th Cir.1992).

**6.** See *Wulf v. City of Wichita,* 883 F.2d 842, 871 (10th Cir.1989).

**7.** See *Godinet v. Management & Training Corp.,* 56 Fed.Appx. 865 (10th Cir.2003).

three months. The parties declined. Armed with this instruction, the jury found that plaintiff sustained no damages due to lost wages or lost benefits.

Defendant submits that under the calculation method presented to the jury, plaintiff suffered no lost wages or lost benefits, as his new employment was at a higher salary than his employment with the defendant. According to the defendant, plaintiff's higher salary with Venator Group offset any losses plaintiff may have suffered as a result of his termination. In so arguing, defense counsel assumes a hypothetical $1,000 annual increase in plaintiff's salary with the defendant every year for the past three years.

The court accepts defendant's view of plaintiff's likely salary increases had he remained in defendant's employ. Although the court recognizes that plaintiff did in fact receive pay raises of approximately $3,000 in 1998 and $8,000 in 1999, defendant presented testimony at trial that this rapid increase was unusual and designed specifically to bring the plaintiff and other KFBS employees in line with market salaries. Given that in 1999 the plaintiff was earning a salary comparable to market—a .98 comparison ratio [8]—the court has no reason to assume that such a large pay increase would be repeated in the future. Plaintiff presented no testimony to convince the court otherwise.

▮ The jury, in its advisory capacity, found that plaintiff, who lost his job for three months and then obtained employment at a higher wage rate, did not suffer any lost wages in this matter over the aggregate time period. Because equitable damages are the exclusive province of the court, "considerable discretion is vested in the district court when devising remedies for Title VII violations." [9] The court, in particular, has the power to disregard the jury's advisory verdict when such verdict does not comport with the purposes of Title VII.[10]

In this case, the plaintiff was terminated on April 13, 2000 and began new employment on July 24, 2000.[11] Because the jury's verdict on back pay is only advisory, the court must make its own determination of plaintiff's losses and award back pay, if any, accordingly. Pursuant to the Tenth Circuit decision in *Godinet*, this court will calculate plaintiff's back pay loss on a periodic basis. Evidence presented at trial demonstrates that on October 25, 1999, plaintiff's yearly salary was $39,468 and his monthly rate was $3,289.[12] The same Trial Exhibit shows that plaintiff received a $1,000 bonus. Plaintiff's counsel argues that the $1,000 payment represents an upward "adjustment" in plaintiff's salary. The court disagrees. The $1,000 payment is specified to be for pay period "Dec. 1—Dec. 15." [13] In the court's view, this lump sum payment represents a bonus, whose payment appears to coincide with the end of the year, when such bonuses are customarily paid. Defendant suggests and the court accepts that plaintiff's salary may have increased by $1,000 each year. As of April 13, 2000, plaintiff's monthly salary was $3,289. However, when such

---

**8.** *See* Plaintiff's Trial Exhibit No. 6.

**9.** *See Estate of Pitre v. Western Electric Co.,* 975 F.2d 700, 704 (10th Cir.1992), *see also Whatley,* 707 F.2d at 1138; *Sears v. Bennett,* 645 F.2d 1365, 1378 (10th Cir.1981) (holding that the court has wide discretion in fashioning remedies to make victims of discrimination whole.).

**10.** *See Rahn v. Junction City Foundry, Inc.,* 161 F.Supp.2d 1219 (D.Kan.2001) (holding that "an award of back pay is an issue for the court.").

**11.** *See* Defendant's Trial Exhibit No. 416.

**12.** *See* Plaintiff's Trial Exhibit No. 6.

**13.** *See* Plaintiff's Trial exhibit No. 7.

$1,000 is taken into account at the end of the calendar year 2000, plaintiff's annual salary for year 2000 would be $40,468 and his monthly salary would be $3,372. Given this estimate of plaintiff's monthly salary, the court finds that between April 13, 2000 and December 31, 2000, plaintiff would have earned $28,662.[14]

Plaintiff suggests that his salary at KFBS would have increased dramatically based on past increases, with further increases upon completion of Cisco certification. The court believes plaintiff presented no evidentiary basis to justify such increases. Given the $1,000 annual increase discussed above, in 2001, plaintiff's annual salary would have been $41,468; in 2002, $42,468; and in 2003, $43,468. Respectively, plaintiff's monthly salary in 2001 would have been $3,456; in 2002, $3,539; and in 2003, $3,622. The trial in this case commenced on June 16, 2003. If the plaintiff were still employed by KFBS, he would have earned $19,921[15] between January 1 and June 16, 2003.

On July 24, 2000, plaintiff was hired as a radio frequency technician with the Venator Group. His starting annual salary was $42,000 plus a bonus of 5% based on achieving corporate objectives. Without a bonus, plaintiff's monthly salary in 2000 was $3,500. Based on the plaintiff's start date, the court finds that the plaintiff's minimum earned salary from Venator Group in 2000 would have been $21,000, and maximum, taking into account the 5% bonus, $22,050.[16] Because no evidence was presented either way, the court will err on the side of the plaintiff and assume that he did not receive a bonus in 2000. As evidence of plaintiff's 2001 salary, defendant presents plaintiff's response to Interrogatory No. 4, where plaintiff states that his income from Footlocker (known in this order as Venator Group) was $43,462.[17] This would put plaintiff's monthly salary for 2001 at $3,622. No contrary evidence was presented to the court, therefore the court will accept defendant's determination of plaintiff's 2001 salary.[18] In 2002, plaintiff's annual salary at the Venator Group was $42,067; his monthly salary being $3,506.[19] Plaintiff testified at trial that his 2003 annual salary is set at $46,959, with the monthly salary being $3,913.[20] Given this estimate of plaintiff's monthly salary, the court finds that between January 1,

---

**14.** This amount was arrived at by multiplying plaintiff's monthly rate of 3,372 by 8 and adding $1,686, which represented two weeks of pay in 2000.

**15.** This amount was arrived at by multiplying plaintiff's monthly rate of $3,622 by 5 and adding $1,811, which represents two weeks of pay.

**16.** To arrive at this calculation, the court will assume that the plaintiff received a 5% bonus in 2000, which would increase his annual salary to $44,100 and increase his monthly salary to $3,675. Given that plaintiff worked at Venator Group for 6 months, 6 × $3,675 = $22,050. In his response to Interrogatory No. 4, plaintiff states that in 2001 he earned $32,907 from Venator Group. The court must reconcile the salary it finds plausible based on plaintiff's offer letter with his interrogatory response. The court believes that

the plaintiff erroneously added the salary from Venator Group to the salary he received between January 1 and April 12 at KFBS, which, amounted to $10,689 (composed of $9,867 earned in the first three months, plus $822 earned in the first 12 days of April). Therefore, the court will substitute its own calculation for plaintiff's interrogatory response.

**17.** *See* Defendant's Trial exhibit No. 420.

**18.** Plaintiff's counsel in the Reply suggests that plaintiff's 2001 salary was only $42,067. No evidence was ever submitted to the court to support this assertion.

**19.** *See* Defendant's Trial exhibit No. 419, rounded to the nearest whole dollar amount.

**20.** *See* Defendant's Response to Plaintiff's Brief in Support of Damages, (Doc. 121), p. 4.

2003 and June 16, 2003, plaintiff earned $21,521.[21]

Based upon the above calculations, the court constructs the following table, which compares the salary plaintiff would have earned at KFBS with the salary he did in fact earn for his work at the Venator Group during the period in question:

| | Continued at KFBS (Presumed) | Actual Income at Venator Group | Loss |
|---|---|---|---|
| 2000 (4/13–12/31) | $28,662 | $21,000 | ($7,662) |
| 2001 | $41,468 | $43,462 | |
| 2002 | $42,468 | $42,067 | ($ 401) |
| 2003 (1/1–6/16) | $19,921 | $21,521 | |
| **TOTAL LOSS** | | | ($8,063) |

As a result, the court finds that the plaintiff is entitled to an award of back pay damages in the amount of $8,063.

■ In addition to his motion for back pay, plaintiff moves the court to enter an award for back benefits in the amount of 25% of his lost wages. Estimating his lost wages at $12,000, plaintiff's counsel requests $3,000 in lost benefits. Defendant, in its response, claims that the plaintiff has suffered no loss in benefits because he admitted his benefits at Venator Group are "comparable" to the benefits he received at KFBS. Plaintiff's counsel tried to present evidence that plaintiff lost $150 a month for the first nine months of his employment for health insurance costs, but on cross-examination plaintiff admitted that Venator Group actually reimbursed his COBRA premiums for the months in question.[22] There was no other testimony regarding benefit comparison between Venator Group and KFBS. Despite plaintiff's claim that his lost benefits at amounted to 25% of his lost wages from employment with KFBS, the court finds that no compelling evidence supports this assertion, and the court refuses to speculate on the amount of any such loss in benefits, if any. The jury advised the court that plaintiff suffered no lost benefits and the court, having evaluated all the evidence, agrees.

## B. FRONT PAY

■ In addition to back pay, the court may, in its discretion, award plaintiff front pay.[23] The award of future wages is designed to compensate the plaintiff for any economic loss from the date of the trial until a date certain in the future when such loss is extinguished.[24] "In determining whether, and how much, front pay is appropriate, the district court 'must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall.' "[25]

Plaintiff's counsel argues that because plaintiff was a highly regarded and valued employee and because he planned to re-

---

**21.** This amount was arrived at by multiplying the monthly salary of $3,913 by 5 and adding $1,956, which represents two weeks of salary.

**22.** The court agrees with the defendant's contention that plaintiff's $150 per month COBRA payments made while he was unemployed is an out-of-pocket expense, and as such, was adequately considered and compensated by the jury.

**23.** See Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945 (10th Cir.1980); see also Daneshvar v. Graphic Technology, Inc., 40 F.Supp.2d 1225 (D.Kan.1998).

**24.** See Carter v. Sedgwick County, Kansas, 929 F.2d 1501, 1505 (10th Cir.1991) ("In light of the remedial purpose of Title VII, an award of front pay should be limited to the amount required to compensate a victim for the continuing future effects of discrimination until the victim can be made whole."), citing Pitre v. Western Electric Co., 843 F.2d 1262, 1278 (10th Cir.1988).

**25.** See Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1458 (10th Cir.1997), quoting Standley v. Chilhowee R–IV School District, 5 F.3d 319, 322 (8th Cir.1993), see also Carter v. Sedgwick County, Kansas, 36 F.3d 952, 957 (10th Cir.1994) (stating that front pay should "make plaintiff whole").

main with the defendant until retirement, he "should be compensated with a view to making him whole."[26] Plaintiff's counsel urges the court to assume the plaintiff would have earned approximately a $12,000 bonus every two to three years and that his income would have doubled upon completion of his Cisco training. In addition, plaintiff argues that he should be compensated for the extra mileage and wear on his car that results from his 60 mile daily round trip drive to his new job "for the next 25 years."

Defendant presents two lines of defense. First, defendant argues that plaintiff's counsel waived all claims to front pay because of his explicit representations during the opening statement. Second, defendant argues that plaintiff failed to substantiate any claim for future damages and that evidence shows plaintiff will not suffer any future losses at his new, higher-paying, job.

Plaintiff, in seeking future wages, relies on the assertion that he would have continued to receive approximately $12,000 pay raises every 2–3 years during his employment with the defendant and that his income would have doubled once he completed Cisco training. Plaintiff presented no evidence that the approximately $12,000 pay increase that the plaintiff received between 1997 and 1999 was the ordinary practice at KFBS. Furthermore, plaintiff did not refute the testimony of plaintiff's former supervisor, Paul Pullen, that such raises were in fact an extraordinary attempt to bring everyone at KFBS up to market. Neither did the plaintiff refute Paul Pullen's testimony that KFBS does not pay increased compensation to employees who complete Cisco certification and that plaintiff's income would not have increased due to this additional training. Plaintiff simply claims his income would have doubled, but presents no evidence, in the form of statistics or credible testimony, to that effect.[27] Defendant points out that plaintiff has since completed his Cisco training; however, his compensation at Venator Group did not double following the certification.

The court finds that the plaintiff did not present convincing evidence that would support his claim for future wages. The court further finds that plaintiff has been made whole, and to award plaintiff future wages would result in an unjustified windfall contrary to the spirit of Title VII. Because the court concluded that the plaintiff has been made whole and an award of front pay is not appropriate, the court declines to address the question of whether plaintiff's counsel waived the claim for future compensation before or during trial.

Finally, the court declines to award plaintiff front pay damages for his mileage for driving to work at Venator Group in Junction City rather than driving to work in Manhattan. The plaintiff did not supply the court with any legal authority supporting his claim, and the court finds none.

## C. INTEREST

■ Plaintiff requests that the court award plaintiff prejudgment and post-judgment interest on equitable damages. Interest on the back pay award ensures that the plaintiff is made whole by taking into account the time value of money and compensating the plaintiff for the time the

---

**26.** *See* Plaintiff's Brief in Support of Damages (Doc. 115), p. 4.

**27.** In his Reply (Doc. 124), plaintiff appears to have abandoned his claim that his income would have "doubled" post-Cisco certification in favor of claiming his services would have been "more valuable." While that may be the case, plaintiff still failed to present credible evidence, beyond his own self-serving assertions regarding his likely salary, that the defendant would have been willing to place a monetary premium on this training.

money rested with the defendant. Without such an award, defendant would enjoy an interest-free loan in the amount of plaintiff's damages. By ordering postjudgment interest, the court achieves the statutory goal of compensating the plaintiff while removing defendant's incentive to delay payment of judgment. The decision of whether to award interest and the determination of the rate rest within sound discretion of the trial court.[28]

 Title VII does not provide a uniform statutory rate of prejudgment interest. The courts have employed a variety of methods to determine the proper interest rate. Some courts have determined the rate by using the prime rate, the prime rate averaged over a period of time, adjusted prime rate, 90% of the prime rate, while others have used the rate set by the Internal Revenue Service on overpayments and underpayments, United States Treasury's "T-bill rate," the rate used in cases before the National Labor Relations Board, and the states' statutory rate of interest on money judgments.[29]

A number of courts in the District of Kansas have used the 10% statutory rate set forth in K.S.A. 16–201.[30] However,

because the rate of prejudgment interest is left to the discretion of the trial judge, this court will independently determine whether the 10% statutory rate accurately reflects economic reality. The court must ensure that the plaintiff is made whole without awarding him a windfall at the expense of the defendant. Given the economic conditions prevailing in the past three years, the court considers the statutory rate of 10% not to be the most appropriate means of computing prejudgment interest in this case. Instead, this court will use the rate used by the Internal Revenue Service in cases of income tax underpayments and overpayments, computed under 26 U.S.C. § 6621. The court finds that such rate better reflects economic reality and notes that a number of courts in various jurisdictions have concluded that this is the preferred method of calculating prejudgment interest.[31]

The following rates were in effect for the applicable periods of time: for 2001, the rate was 7.945%[32]; for 2002, the rate was 6%; and for 2003, the rate is set at 5%. Although the Internal Revenue Code allows for daily compounding of interest,[33] the court finds that annual compounding

**28.** See Hillman v. United States Postal Service, 257 F.Supp.2d. 1330, 1335 (D.Kan.2003), see also Kleier Advertising, Inc. v. Premier Pontiac, Inc., 921 F.2d 1036, 1042 (10th Cir.1990) ("Because there is no federal statutory interest rate on prejudgment interest, the rate imposed will be left to the trial court's discretion."); Whatley, 707 F.2d at 1140.

**29.** See "Allowance and Rates of Interest on Backpay Award Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.)," by Donald T. Kramer, 138 A.L.R. Fed. 1, 1997 WL 475153 (Updated July 2003).

**30.** See Daniel v. Loveridge, 32 F.3d 1472, 1478 (10th Cir.1994), see also DuBose v. Boeing Co., 905 F.Supp. 953, 960 (D.Kan.1995), Barvick v. Cisneros, 953 F.Supp. 341, 343 (D.Kan. 1997), Hillman, 257 F.Supp.2d 1330, 1335–36.

**31.** See, e.g. EEOC v. Regency Architectural Metals Corp., 896 F.Supp. 260 (D.C.Conn. 1995), Frazier v. Southeastern Pa. Transp. Auth., 814 F.Supp. 11 (E.D.Pa.1993), Miller v. Swissre Holding, Inc., 771 F.Supp. 56 (S.D.N.Y.1991), Amos v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints, 618 F.Supp. 1013 (D.C.Utah. 1985), EEOC v. Guardian Pools, Inc., 828 F.2d 1507 (11th Cir.1987).

**32.** The rate was 9% between January 2001 and March 2001; 8% between April 2001 and June 2001; and 7% between July 2001 and December 2001. Based on these rates, the average annualized rate in 2001 was 7.945%.

**33.** 26 U.S.C. § 6622(a).

better serves the purposes of Title VII. Therefore, the court finds that in addition to the back pay award of $8,063, the plaintiff is entitled to prejudgment interest in the amount of $1,363.[34]

■■■■ Plaintiff further requests the court to award postjudgment interest. Postjudgment interest is appropriate in Title VII cases.[35] Under federal law, effective October 1, 1982, interest on a money judgment recovered in a civil case in a district court is calculated

> at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.[36]

The judgment in this case will be entered on July 23, 2003. Therefore, the postjudgment interest on plaintiff's award is to be calculated at the rate provided by 28 U.S.C. § 1961(a), compounded annually, from July 23, 2003 through the date of payment.

## D. OTHER EQUITABLE RELIEF

If the court declines to award plaintiff front pay, plaintiff's counsel requests that the court order reinstatement of the plaintiff with the defendant. Furthermore, in the "conclusion" section of his brief, plaintiff requests that defendant "be required to post a notice that in its last two trials on sexual discrimination, defendant has been found guilty of discrimination ..., be ordered to subject its managers to sexual discrimination training and to post notices to that effect ..., and be required to post that defendant violated Mr. Wirtz's civil rights while employed with defendant." [37]

■■■ With respect to the plaintiff's reinstatement claim, defendant argues first, that plaintiff waived his reinstatement claim, and, second, that the entity which used to employ the plaintiff no longer exists and the court cannot order reinstatement with a non-existent company. Ordering reinstatement lies wholly within the discretion of the court.[38] As defendant points out in its response to plaintiff's motion for damages, plaintiff testified in his deposition that he did not desire reinstatement to his former position. No contrary testimony was presented at trial. Furthermore, in the section of the Pretrial Order devoted to non-monetary relief requested, plaintiff indicated "none." It is well-settled that the pretrial order controls the subsequent course of the litigation.[39]

---

**34.** This amount was calculated in the following manner: plaintiff incurred a $7,662 loss by December 31, 2000, with interest accruing beginning January 1, 2001. Therefore, in calendar year 2001, plaintiff's prejudgment interest is $609, derived by multiplying $7,662 by 7.945%. Because the interest is compounded, plaintiff's prejudgment interest in 2002 is $496, derived by multiplying $8,271 by 6%. Through the end of 2003, plaintiff's prejudgment interest would have been $458, derived by multiplying $9168 (which figure is derived by adding the accumulated interest and principal of $8,767 and the additional loss of $401) by 5%. However, in 2003 the interest is computed only through the date of the judgment—July 23. Therefore, between January 1, 2003 and July 23, 2003, the plaintiff is entitled to receive $258 in interest. Total interest is derived by adding together $609, $496, and $258.

**35.** *See Estate of Pitre v. Western Electric Co.,* 735 F.Supp. 994 (D.Kan.1990) (awarding postjudgment interest on back pay award in a Title VII action).

**36.** *See* 28 U.S.C. § 1961(a).

**37.** *See* Plaintiff's Brief in Support of Damages (Doc. 115), p. 14.

**38.** *See DuBose,* 905 F.Supp. at 958 (D.Kan.), *see also EEOC v. General Lines, Inc.,* 865 F.2d 1555, 1560–61 (10th Cir.1989); *Whatley,* 707 F.2d at 1137.

**39.** *See Trujillo v. Uniroyal Corp.,* 608 F.2d 815, 817 (10th Cir.1979), *see also Southern*

Therefore, the court finds that the plaintiff waived his claim for reinstatement and the court declines to revisit the issue at this late date.

With respect to relief consisting of various notices and training, the court notes that plaintiff has never before, to the knowledge of the court, requested such relief. As noted above, plaintiff marked "none" in the section of the Pretrial Order devoted to non-monetary relief requested. As such, the court deems plaintiff to have waived all such claims.

## E. ATTORNEY'S FEES AND COSTS

Plaintiff requests in his brief that the court award him costs and attorney's fees because he was the "prevailing party" in this action. The court preliminarily finds, subject to specific proof or agreement between the parties, that, as a prevailing party, plaintiff is entitled to recovery of his costs, and reasonable attorney's fees. The court reminds the parties that it will require compliance with the procedures outlined in local and federal rules in addressing the issues of attorney's fees and costs.

**THEREFORE, IT IS ORDERED** that plaintiff's motion for front pay, back pay, interest, other equitable relief, costs, and attorneys fees (Doc. 115) is granted in part and denied in part as follows: plaintiff shall recover from defendant back pay in the amount of $8,063, with prejudgment interest thereon in the amount of $1,363; plaintiff's costs and reasonable attorney's fees; compensatory damages as found by the jury in the amount of $1,000; pecuniary damages as found by the jury in the amount of $12,000; and punitive damages

*Pacific Transportation v. Nielsen,* 448 F.2d 121, 125 (10th Cir.1971) (The trial judge may

as found by the jury in the amount of $20,000.

reject contentions not included in a proper pretrial order.).