**Patricia RAINEY, Plaintiff,**

v.

**TOWN OF WARREN, Kathleen Raposa, in her official capacity as Warren Town Treasurer; Anthony Primiano, in his individual capacity and in his official capacity as former Sergeant of the Warren Police Department; Louis Dutra, individually and in his official capacity as former Detective of the Warren Police Department; United Steelworkers of America, AFL—CIO—CLC; United Steelworkers of America, AFL—CIO—CLC, Local Union 8688, Defendants.**

**C.A.No. 97–040L.**

United States District Court,
D. Rhode Island.

Jan. 10, 2000.

Gerald C. DeMaria, Higgins, Cavanagh & Cooney, Providence, RI, Patricia E. Andrews, Providence, RI, for plaintiffs.

Richard M. Pierce, Roberts, Caroll, Feldstein & Peirce, Inc., Providence, RI, for defendants United Steelworkers of America and United Steelworkers Local.

## OPINION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the motion for summary judgment filed by the United Steelworkers of America (the "International Union") and Local 8688 (the "Local Union") (collectively, the "Union Defendants") on the Title VII and state

analogous claims asserted against them in plaintiff's Complaint. This case illustrates the wisdom of Congress in making Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") applicable to labor unions. To ensure that discrimination and harassment are rooted out of the workplace, Title VII makes both employers and labor organizations accountable for their discriminatory acts. If Title VII only included the former it would often fail in its mission. This is because labor organizations stand as a firewall, as protection for its members, in the face of employer discrimination. Labor organizations therefore occupy a critical battle-line position in fighting discrimination and harassment. As a result, labor organizations can either choose to fight the good fight or tacitly encourage employer discrimination and harassment by intentionally failing to stand their guard. The Union Defendants in this case unfortunately appear to have chosen the latter course.

Pending before this Court is the lawsuit of plaintiff, Patricia Rainey, against her former employer, the Town of Warren (the "Town") and two of its former police officers: former Detective Louis Dutra ("Dutra") and former Sergeant Anthony Primiano ("Primiano"). Plaintiff sued a number of other Warren police officials but they have been dismissed from this case. Plaintiff claims that the Town, Dutra and Primiano have discriminated against her, because of her gender, and forced her to work in a hostile work environment in violation of Title VII, 42 U.S.C. § 1983 and the Rhode Island Fair Employment Practices Act ("FEPA"), R.I.Gen.Laws § 28-5-1, et. seq. (1995)[1]. Rainey has also sued the Union Defendants for violations of Title VII and FEPA.[2] Specifically, plaintiff

---

1. FEPA is the state analogue to Title VII. The state law claims under FEPA require the same analysis as that utilized for the corresponding federal statutes. *See Eastridge v. Rhode Island College,* 996 F.Supp. 161 (D.R.I. 1998) (citations omitted). Consequently, summary judgment must be denied as to the state law claims for the same reasons summary judgment is denied with respect to the

federal law claims discussed in this opinion. *See Tardie v. Rehabilitation Hospital,* 6 F.Supp.2d 125, 132–33 (D.R.I.1998), *aff'd,* 168 F.3d 538 (1st Cir.1999).

2. FEPA applies to labor organizations under § 28-5-7(3).

claims that both the International and the Local Union knew that she was being subjected to sexual harassment and discrimination at her place of work, but, in violation of Title VII and FEPA, failed to file grievances on her behalf and otherwise take prompt remedial action to end the harassment.

The Union Defendants have moved for summary judgment on plaintiff's Title VII and FEPA claims.[3] For the reasons set forth in this opinion, the motion of the Union Defendants is denied.

## I. *Background*

On a motion for summary judgment, the court must view all evidence and related reasonable inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 106 (1st Cir.1997). The following factual recital is constructed with that rule of law in mind.

Plaintiff worked as a civilian police dispatcher for the Town of Warren commencing on or about August 9, 1994. Plaintiff's employment ended on or about February 15, 1996. In her Complaint, plaintiff avers that her usual work shift was midnight to 8:00 A.M. and that she worked with Primiano, who was her immediate supervisor, and two other police officers. Plaintiff was the only female dispatcher. *See* Plaintiff's memo. at 3. The other dispatchers were Edward Pacheco, Joseph Vieira and Scott Almeida. The male dispatchers, including the Local Union Steward, Almeida, believed that plaintiff received preferential treatment because she was a woman and, as a result, plaintiff and the male dispatchers did not appear to get along. *See* De-

Sisto Report at 4 and Hartman depo. at II: 105.

The activity of three union representatives during the relevant time period is important in determining what knowledge the International and Local Unions acquired of plaintiff's complaints of discrimination. Frank Francis, the Local Union President and Almeida, the Local Union Steward, worked closely together. As Union Steward, Almeida worked as liaison between the union members and the officers of the Local Union. Almeida was the person who handled the union members' grievances. *See* Francis depo. at 17. Upon receiving either a formal grievance or an informal complaint, Almeida was to bring it to the attention of Francis. *See* Almeida depo. at 41–42. Almeida brought such complaints to the attention of Francis on numerous occasions. *See* Francis depo. at 66. The last member of the trio is William Kennedy, who was the staff representative assigned by the International Union to the Local Union. Kennedy regularly attended monthly meetings of the Local Union and regularly spoke with Francis regarding grievances and complaints which would arise within the Local Union. *See* Union Defendants' Exhibit 4.

During her employment, plaintiff and the other dispatchers were members of both the Local Union and the International Union. In fact, the International Union's Constitution provides that the members of the Local Union shall also be members of the International Union. *See* Plaintiff's Exhibit 1 at p. 4. The terms and conditions of the employment of union members were governed by a collective bargaining agreement ("CBA") entered into between the Town and the International Union, which was effective from July 1, 1994

---

**3.** The Union Defendants argue that since the Title VII claims must be dispatched, the state FEPA claims must be dismissed for lack of federal jurisdiction. That is not necessarily so, because there is a § 1983 claim pending against the other defendants in this case. *See Hart v. Mazur*, 903 F.Supp. 277, 281 (D.R.I. 1995) (holding that exercise of supplemental jurisdiction over state law claims against some defendants is proper where there is original jurisdiction to hear federal claims against other defendants, so long as both federal and state law claims arise from the same nucleus of operative facts). In any event, in view of the outcome of the Union Defendants' motion, it is unnecessary to become entangled in the bramble bush of supplemental party jurisdiction.

through June 30, 1997. *See* Union Defendants' Exhibit 1. The International Union signed the contract on behalf of the Local Union. *Id.* The CBA did not have a clause prohibiting employer harassment or discrimination. *Id.* However, in his deposition, Local Union President, Francis, stated that the CBA covers sexual harassment and gender discrimination. *See* Francis depo. at 34. Furthermore, the Local Union's answer to interrogatory # 79 establishes the fact that "[t]he local union regards [these] . . . as grievable offense[s] even though not specifically set forth in the collective bargaining agreement." Consequently, it is clear that both Unions understood the CBA to cover complaints of sexual harassment and gender discrimination.

In their depositions, both Almeida and Francis described a similar process for resolving the complaints of union members. Upon learning of a union member's problem, Francis explained that he would go directly to the Chief of Police prior to invoking the grievance-arbitration provision in the CBA. *See* Francis depo. at 70–72 and Union's Answers to Interrogatories, # 9 and # 10. If the matter was resolved at this point no grievance was filed. *Id.* However, if management's response was unsatisfactory, a union member was allowed to file a grievance. *Id.* at 50. Francis allowed union members to filed grievances even if there was only "a slight chance of winning." *Id.* at 78. Further, Francis never told union members who had complaints to take matters into their own hands or to go to the Chief directly. *Id.* at 51–52, 71–72. This last fact directly contradicts the Local Union's contention that Local Union members were informed that they should communicate directly with a superior to resolve work-related problems. *See* Local Union's Answers to Interrogatories, # 38. In describing this same process, Almeida stated that, with the exception of plaintiff, he could not think of another instance in which a union member came to him with a problem and he told the member to go to

the Chief of Police. *See* Almeida depo. at 31–32.

In his deposition, Almeida stated that he usually discussed complaints with the Chief directly. If the matter could not be resolved that way, then Almeida proceeded to file a formal grievance pursuant to the CBA. *See* Almeida depo. at 33–34, 65. It is clear that filing a grievance was not an involved process. Before filing a grievance, Almeida stated that he did not have to seek approval from a union officer. *See* Almeida depo. at 62–63. In fact, Almeida explained that "[he] just had the grievance pad with [him] and [ ] had the person fill it out." *Id.* When Almeida was asked how he determined whether a union member's complaint was grievable under the CBA, he responded simply: "I give them the . . . grievance pad. If they want to fill it out and file a grievance, they could fill it out, and I would submit it." *Id.* at 64–65. It appears that this process was so perfunctory that Almeida was unable to recall any instance in which a union member came to him with a problem and, after examining the CBA, he determined that the union member's complaint was not grievable under the contract. *Id.*

Plaintiff has presented facts indicating that on several occasions the Local Union responded to complaints made by male dispatchers. First, Almeida testified that Joseph Vieira, a male dispatcher, spoke to him about the fact that dispatchers were not receiving "comp time." After researching whether this complaint was grievable, Almeida concluded that it was and gave Vieira the grievance pad. *See* Almeida depo. at, 37–39, 62–63. Almeida even assisted Vieira in filling out the grievance form. *Id.* at 66. Second, Captain Ely Barkett of the Warren Police Department testified that Pacheco was suspended for typing some colorful expletives into a computer, which an elderly female police clerk found offensive. *See* Barkett depo. at II: 89. As a result of this conduct, Pacheco was suspended. The Local Union

filed a grievance in response to Pacheco's suspension and, as the Union put it, the matter was "resolved favorably." Unions' Answers to Plaintiff's Interrogatories, # 49. Third, a grievance was filed on behalf of Almeida that related to his bidding for a job in the Highway Department. *See* Plaintiff's memo. at 10. Fourth, Almeida even successfully filed a grievance for Vieira because the dispatchers did not have lockers. *See* Almeida depo. at 33–34.

Finally, in his deposition, Local President Francis recalled speaking to the Chief of Police on at least twenty occasions after having been told about complaints by union members. These examples indicate that the union was actively involved whenever a union member had even a minor complaint. However, Francis could not recall any time when he went to the Chief with a complaint on behalf of a female union member. *See* Francis depo., p. 71–72.

The response to the male union members' complaints described above is markedly different from the response plaintiff received when she presented her numerous complaints to the Union. From soon after she started to work as a dispatcher until about the end of January, 1996, plaintiff complained to Almeida about problems she was having at work. Plaintiff first brought her problems to the Chief of Police. When management was unable or unwilling to resolve her problems, plaintiff went to Almeida. As discussed below, Almeida consistently told plaintiff that he would have to check with Francis before he could take any action. *See* Rainey depo. at 31. Each time Almeida came back to plaintiff, he explained that her problems were not union issues because her claims were not explicitly covered by the CBA, thus, the Union could not help her. *Id.* Several times, Alemida told plaintiff that the CBA did not cover sexual harassment that occurred on the job. This directly contradicts the deposition testimony of the union representatives, who stated

that the CBA does, in fact, cover sexual harassment.

In this case, the sexual harassment of plaintiff is not seriously controverted. Without even considering the testimony of plaintiff, Primiano admitted that he made at least 100 sexual comments to plaintiff while he was her supervisor. *See* Primiano depo., II at 62–63. Additionally, Primiano admitted that he physically touched plaintiff on the neck and upper thigh on several occasions. Plaintiff repeatedly complained to Almedia about Primiano's conduct. *See* Plaintiff's Response to Unions' Interrogatories, # 15. Indeed, plaintiff went so far as to impress on Almedia that she was afraid to be alone with Primiano at work. Such complaints were even made during telephone calls to Almeida's residence. According to plaintiff, Almeida was well aware of the frequency and extent of the sexual harassment. Almeida was also aware that plaintiff had visited the home of Captain Barkett to complain about the conduct of Primiano.

When plaintiff complained to Alemida, she asked what "could be done under her union contract." Rainey depo. at 56–57. It was then that Almeida told plaintiff that he would get back to her after checking with Francis. After doing so, Almeida informed plaintiff that her problems were not grievable under the CBA. Despite plaintiff's response that she was concerned for her safety on the job, Almeida reiterated that there was nothing that the Local Union could do and that Francis told him that the Local Union would not accept any grievance from plaintiff. *See* Plaintiff's Response to Interrogatories, # 15. Such encounters are only a sampling of what plaintiff endured on the job. Even after plaintiff complained to Almedia about being struck in the face with a file by Detective Dutra, Almeida was unable to answer whether the Local Union could do anything about that matter. It was not until weeks after plaintiff approached Almeida with that issue that Almeida informed plaintiff that he and Francis again deter-

mined that there was nothing that could be done under the CBA. *See* Rainey depo. at 45–46, 49. Finally, plaintiff complained to Almeida about the female accommodations. Specifically, she complained about having to share a locker room with the men and of the dirty bathroom facilities which she had to use. *Id.* at 35, 50–54. Again, Almeida did nothing in response to complaints made by plaintiff and refused to file a grievance on her behalf.

Just prior to January 26, 1996, plaintiff again spoke with Almeida. She told him: "I just couldn't stand what was going on anymore. I reiterated a lot of things ... I was trying to ... show him that since I started there I was subjected to really unfair treatment." Rainey depo. at 57. Significantly, Almedia does not dispute that Rainey complained to him. For example, he admits that Rainey told him that Primiano was rubbing her shoulders and engaging in inappropriate conduct. *See* Almeida depo. at 76–77. It is evident that Almeida was well aware of the extent of plaintiff's problem. During one of the conversations in which plaintiff complained about Primiano, Almedia learned that plaintiff was bringing pepper spray with her to work. *Id.* at 95. Almeida also confirmed that plaintiff told him about the incident in which she went to Barkett's home in the middle of the night to complain about Primiano. He also testified that plaintiff told him about the incident with Dutra in which he hit her with a file. Almeida also admits that plaintiff complained about the locker and bathroom situation. *Id.* at 94, 97–98. Almeida filed grievances for male union members to get lockers, but failed to do anything for plaintiff in that regard.

With respect to his response to all of plaintiff's complaints, Almedia contradicts plaintiff's recollection of what happened. He claims that in response to all of her complaints he told her to speak with the Chief of Police or a superior officer. *See* Local Union's Answers to Interrogatories, 18, 29 and Almeida depo. at 77–78.

Almeida testified that he did not speak to Francis about plaintiff's complaints because the Chief told Almeida that the problems would be dealt with internally. *See* Almeida depo. at 51. Almedia's decision to allow management to resolve plaintiff's complaints is surprising in light of the more hands-on approach used with complaints made by other male union members discussed earlier. His ambivalence regarding plaintiff's problems is indicated by the fact that Almedia did not remember even asking whether or not her issues had been resolved by management. *Id.* at 83, 135.

On January 26, 1996, plaintiff decided that she needed to get someone's attention because, up to that point, her complaints fell on deaf ears. On that day, plaintiff confronted the Chief and told him that she felt that she would either end up "dead or raped on the job." *See* Plaintiff's Answers to Interrogatories by Perrotto, # 6. Plaintiff had become so desperate at this point that, as she put it: "I didn't care ... where my help came from ... whether it came from the union, or whether it came from [a] lawyer, or whether it came from the department. I just needed that to stop." Rainey depo. at 57. After this conversation, the Town began its investigation.

Town Manager, Michael Hartman, spoke with Francis and Kennedy, the International Union representative, in order to find out whether plaintiff had complained to the Unions. Francis told Hartman that the Local Union had received no complaints from plaintiff about her treatment on the job. *See* Hartman depo. at 88. When Hartman spoke to Kennedy, the latter told him that "their steward [Almeida] had indicated that there had never been any kind of an indication that the employee had a problem." *Id.* at 86–88. This evidence is significant because in a separate investigation conducted by Town Solicitor Anthony DeSisto, Almeida told DeSisto that, after January 26, plaintiff telephoned him and complained *again* that she was

"tired of the harassment." *See* DeSisto Report.

Fed up with her treatment by the Town and the Local Union, plaintiff resigned from her job, secured an attorney and filed a five-count Complaint in this Court. Counts I and II assert that all of the defendants are liable to plaintiff under Title VII and FEPA for "engaging in, tolerating or failing to prevent the sexual harassment." Complaint at ¶ 98. In Counts III and IV plaintiff further alleges violations of the same federal and state statutes to the effect that "[b]ecause she is female, plaintiff has been treated differently than other similarly situated males in the terms and conditions of her employment." In Count V, plaintiff makes an equal protection claim pursuant to 42 U.S.C. § 1983, but that Count does not apply to the Union Defendants, so that matter is not an issue now.

In support of their motion for summary judgment on Counts I through IV, the Union Defendants set forth the following arguments. First, they contend that plaintiff cannot prove a prima facie Title VII case against them. *See* Union Defendants' memo. at 9–22. Second, the Union Defendants argue that summary judgment is appropriate even under the "acquiescence theory" because plaintiff cannot prove that the Local Union failed to file her grievances for discriminatory reasons. *See* Defendants' memo. at pp. 22–24. Third, the Local Union asserts that summary judgment should be granted to it because it is not a covered entity under Title VII since it is not engaged in interstate commerce. *See* Defendants' memo. at pp. 24–27 and Supplemental memo. Finally, the International Union posits that summary judgment should be granted to it (even if the Local Union is not granted summary judgment) because it did not instigate, support, ratify, or encourage any discrimination against plaintiff. *See* Union Defendants' memo. at 27–30.

## II. *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a motion for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co.,* 133 F.3d at 106. "Summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991).

## III. *Discussion*

### A. The Local Union is a "Labor Organization" Under Title VII

█ The issue of whether the Local Union is a covered entity under § 701(e) of Title VII is dealt with first, since a negative answer would require this Court to enter judgment for the Local. Plaintiff contends that the Local Union is a "labor organization" within the ambit of Title VII because, in its capacity as a union, it falls

within the statutory definition of "any organization of any kind ... in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment ..." § 701(d) of Title VII, 42 U.S.C. § 2000e(d). The Local Union counters, *inter alia*, that Title VII does not apply because the Local Union is not engaged in an industry affecting interstate commerce. *See* Union Defendants' Supplemental memo. at 4–6. Under the terms of § 701(d), the Local Union cannot be considered a "labor organization" unless it is engaged in an industry affecting interstate commerce.

The critical section in question is § 701(e) of Title VII, which states in pertinent part:

A labor organization shall be deemed to be engaged in an industry affecting commerce if ... such labor organization—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended;

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization ...

42 U.S.C. § 2000e(e). The issue of whether the Local Union is engaged in an industry affecting commerce comes down to whether or not the Local Union falls into subparagraph (4) of § 701(e).

When interpreting statutes, courts must rely on the language of the enactments. Both the Supreme Court and the First Circuit Court of Appeals have emphasized this basic tenet. In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity on an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *in accord, Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291, 295, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995); *Hogan v. Bangor & Aroostook R.R. Co.*, 61 F.3d 1034, 1037 (1st Cir.1995). Because the plain meaning of the statute resolves the issue sub judice, this Court need not engage the legislative history or search for other interpretive aids. *See Barnhill v. Johnson*, 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir. 1987).

Unfortunately, the case law regarding the application of § 701(e) is sparse. Nevertheless, in addressing this issue, the Local Union erroneously argues that subparagraph (3) of § 701(e) applies to local labor organizations, while subparagraph (4) concerns national labor organizations. It is clear from the plain meaning of the statute that the Local Union confuses the two subparagraphs. Subparagraph (3) classifies a national or international labor organization as being in an industry affecting commerce if it charters a local labor organization that represents employees of employers engaged in an industry affecting commerce. Thus, the chartering national or international labor organization may qualify under § 701(e), if the local labor organization it has chartered itself satisfies the requirement that it represent employ-

ees of an employer engaged in an industry affecting commerce, even if the chartering national or international does not satisfy the requirement. Conversely, subparagraph (4) addresses the situation where the local labor organization does not itself satisfy the requirement of representing employees of an employer engaged in an industry affecting commerce, yet that local has been chartered by either a national or international labor organization which does satisfy the requirement. Subparagraph (4) is satisfied so long as the members of the local can enjoy membership in the national or international labor organization. In both subparagraphs (3) and (4), the requirement that the labor organization be engaged in an industry affecting commerce is satisfied derivatively through the incorporation of subparagraph (2), which includes national, international and local labor organizations.

Clearly subparagraph (4) was intended to cover the situation in this case. The Local Union represents employees of the Warren Police Department. It is questionable whether the Warren Police Department is engaged in an undertaking affecting interstate commerce seeing that its jurisdiction is intrastate. However, the Local Union was chartered by the International Union which satisfies the affecting commerce requirement. The Union Defendants apparently concede that the International Union meets the requirement of being engaged in an industry affecting commerce since they do not argue to the contrary. Further, the record indicates that the members of the Local Union also enjoy membership in the International Union. Thus, under § 701(e)(4), the Local Union qualifies as a "labor organization" engaged in an industry affecting commerce.

As a last gasp, the Union Defendants rely upon *E.E.O.C. v. California Teachers' Ass'n*, 534 F.Supp. 209, 213–14 (N.D.Cal. 1982), for the proposition that a local labor organization which only represents employees of a state governmental entity is not engaged in an industry affecting commerce under § 701(e). That reliance is misplaced.

The case at bar is distinguishable from *California Teachers' Ass'n* because the local California labor organization in that case was not chartered by a national or international labor organization which represented employees of an employer engaged in an industry affecting commerce. The local labor organization in *California Teachers' Ass'n* was simply a voluntary membership association having no affiliations with another labor organization outside of the State of California that would satisfy the affecting commerce requirement under § 701(e). *Id.* 534 F.Supp. at 209; *see also Saini v. Bloomsburg University Faculty*, 826 F.Supp. 882, 886–87 (M.D.Penn.1993) (same) (citing *California Teachers' Ass'n*). Therefore, § 701(e)(4) was not applicable and the EEOC had to rely on a more tenuous argument regarding § 701(h) of Title VII, which the Court ultimately rejected. In the present case, the fact that the Local Union was chartered by the International Union puts the Local Union in the affecting commerce category under subparagraph (4), and prevents it from escaping the wide net cast by § 701(e) of Title VII.

## B. Plaintiff's Disparate Treatment Claim

Under § 703(c) of Title VII, a "labor organization," such as the Local Union, may not discriminate on the basis of gender and may not cause or attempt to cause an employer to discriminate against an individual because of gender. *See* 42 U.S.C. § 2000e–2(c). In Count III, plaintiff complains of "disparate treatment" by the Local Union for its failure to process her complaints in light of the fact that the Local Union processed complaints of similarly situated male union members. Accordingly, in order for plaintiff to stymie summary judgment, she must show that there is evidence in this record that the Local Union intentionally discriminated

against her because of her gender. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (discussing plaintiff's burden with respect to determining judgment as a matter of law in Title VII cases). This burden may be satisfied by either producing direct or circumstantial evidence. *See Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1093 (1st Cir.1995); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 (3rd Cir. 1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). Absent direct evidence of intentional discrimination, a plaintiff in Rainey's position must resort to the familiar burden-shifting framework set forth in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Resare v. Raytheon Co.*, 981 F.2d 32, 39–44 (1st Cir. 1992) (applying the burden-shifting framework under Title VII in "mixed motive" and "pretext" situations of disparate treatment discrimination); *Iacampo v. Hasbro, Inc.*, 929 F.Supp. 562, 574–575 (D.R.I.1996) (same). This Court need not analyze the entire *McDonnell Douglas* framework for purposes of this motion. For a summary of Title VII disparate treatment jurisprudence in this Circuit, see *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 420–422 (1st Cir.1996).

After examining the evidence proffered by plaintiff, it is clear that the disparate treatment claim is a "pretext" claim.[4] In order to prevail at time of trial in a "pretext" case, plaintiff will have to establish by a preponderance of the evidence that her gender "played a role in [the Local Union's decision making] process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (applying Title VII jurisprudence to age discrimination case).

In an employer pretext case, a plaintiff will defeat a summary judgment motion by submitting evidence which casts doubt on the legitimate reasons offered by the employer, or would allow a fact finder to infer that discrimination was more likely than not a motivating cause for the decision made by the employer. *See Hicks*, 509 U.S. at 510–11, 113 S.Ct. 2742. In other words, because the fact finder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's nondiscriminatory reasons that it unlawfully discriminated against the plaintiff and was merely trying to conceal its act with the articulated reasons, *see id.*, a plaintiff who has established a prima facie case may defeat a motion for summary judgment by pointing to circumstantial or direct evidence that discrimination was more likely than not a motivating factor for the action taken. These same rules apply when the defendant is a labor union. Proof patterns for establishing union liability in disparate treatment claims where the union is alleged to have discriminated actively will not differ from the pattern in cases involving an employer's discriminatory hiring or promotion policies. *See, e.g., Lucas v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 741 F.Supp. 136 (N.D.Ohio 1989), *aff'd*, 904 F.2d 707 (6th Cir.1990); *Commonwealth of Pennsylvania v. Local Union 542, Intern. Union of Operating Engineers*, 469 F.Supp. 329 (E.D.Pa.1978), *aff'd*, 648 F.2d 922 (3rd Cir.), *rev'd on other grounds*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); Larson, 2 *Employment Discrimination*, § 37.04 (2nd ed.1999). Quite simply, if plaintiff has pointed to some evidence discrediting or contradicting the non-discriminatory reasons proffered by the defendant, then summary judgment is unwarranted if plaintiff can show "that

**4.** Since plaintiff does not contend that the Union Defendants failed to file her grievances, in part, for legitimate reasons, this Court assumes that the disparate treatment claim is a "pretext" claim and not a "mixed motives" claim.

the defendant acted with the specific intent" of discriminating against plaintiff. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 39 (1st Cir.1995), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3rd Cir.1994) ("holding that a plaintiff can avoid summary judgment by pointing to some evidence from which a fact finder could reasonably conclude that defendant's proffered reasons were fabricated").

In this case, plaintiff has obviously set forth a prima facie case of disparate treatment, to the extent that the framework established in *McDonnell Douglas*, is applicable. Plaintiff is a member of a protected class, and there is no doubt that the normal grievance procedures were not used for her complaints of sexual harassment. There is also no dispute that different grievance procedures were used for male union members who had complaints. The plaintiff's burden of proof in establishing a prima facie case under Title VII is de minimis. *See Barbour*, 63 F.3d at 38.

The non-discriminatory reasons proffered by the Local Union for not filing plaintiff's grievances are untenable. First, the Local Union previously stated that plaintiff's complaints were not processed because sexual harassment was not a grievable offense covered by the CBA. However, both management and the Local Union have now stated that sexual harassment was covered by the CBA. Of course, to discredit the Local Union's proffered reason, plaintiff cannot simply show that the Local Union's decision was wrong or mistaken, since the factual dispute at issue is whether plaintiff's gender motivated the Local Union, not whether it was wise or competent. *See Villanueva v. Wellesley College*, 930 F.2d 124, 131 (1st Cir.), *cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991); *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 523 (3rd Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

The Local Union has also stated that plaintiff's complaints were not processed because they were not put in writing as required by the grievance procedures. In response, plaintiff has pointed to some evidence that these non-discriminatory reasons are but a pretext, or that her gender more likely than not motivated the Local Unions's actions. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089. Plaintiff, has pointed to the fact that Almeida, the Local Union representative responsible for filing grievances, felt that plaintiff received preferential treatment because she was a woman.

As the First Circuit has recently held in a "pretext" Title VII case, at this stage in the summary judgment analysis, "an inquiring court does not ask whether the plaintiff has adduced direct evidence of discrimination, but asks instead whether the evidence presented, regardless of its character, suffices to raise a genuine issue about the pretextuality of the employer's explanation for" its challenged acts. *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572, 587–88 (1st Cir.1999) In this case, plaintiff's proffered evidence of discriminatory motive, on the part of the Local Union is enough to preclude summary judgment on the "disparate treatment" claim because it indicates a discriminatory motive behind Almeida's refusal to file grievances for plaintiff. It was next to impossible for plaintiff to put her complaints in writing because the union representative from whom she sought help, repeatedly told her that she had no recourse to the grievance procedure and never gave her the grievance pad to fill out. Consequently, plaintiff has successfully pointed to some evidence of a discriminatory motive, thereby satisfying her burden. *See Barbour*, 63 F.3d at 39. Therefore, the Union Defendants' summary judgment motion is denied with respect to the dispa-

rate treatment claims contained in Counts III and IV.

## C. Plaintiff's Hostile Work Environment Claim

 In Counts I and II, plaintiff alleges that the Local Union subjected her to a "hostile work environment" in violation of § 703(c) of Title VII and the FEPA because it encouraged the sexual harassment she endured by refusing to file grievances on her behalf. In response to this claim, the Union Defendants have mistakenly dedicated most of their brief to arguing that summary judgment is proper because the Local Union did not breach its duty of fair representation and, thus, there is no violation of Title VII. *See* Union Defendants' memo. at 10–24. First, although a breach of the duty of fair representation under the National Labor Relations Act can result in a violation of Title VII, it is not a necessary element of plaintiff's case to establish a union's violation of Title VII. *See, e.g., Farmer v. United Catering, Restaurant, Bar and Hotel Workers, (RWDSU), Local 1064,* 1978 WL 201, 21 FEP 1599, 1619–1621 (E.D.Mich.1978), *aff'd sub nom., Farmer v. ARA Serv. Inc.,* 660 F.2d 1096, 1104 (6th Cir.1981) ("In fact, it is almost axiomatic that a union's breach of the duty of fair representation also subjects it to liability under Title VII ..."). Clearly, a union can violate Title VII absent a breach of its duty of fair representation. *Id.* It is axiomatic that a union's failure to adequately represent union members in the face of employer discrimination may subject the union to liability under either Title VII or its duty of fair representation. *See* 2 Larson, *Employment Discrimination,* § 37.05 (2nd ed.1999) (although the two overlap a great deal they are not identical since there are different standards that apply to each). Plaintiff has also made it abundantly clear that her claims under 42 U.S.C. § 1983 are not applicable to the Union Defendants. Thus, while it is necessary for plaintiff to present facts that indicate the presence of "gender animus," to sustain a § 1983 claim or duty of fair representation claim, it is not necessary for plaintiff to show that the Local Union's failure to assert her griev-

ances in light of undisputed sexual harassment contributed to the hostile work environment in violation of § 703(c) of Title VII. In any event, for the reasons stated earlier, it is evident that plaintiff has produced evidence of gender animus on the part of Almeida, the union steward responsible for filing grievances. However, because such proof is not necessary to impose liability on the Local Union under the hostile work environment claim, many of the arguments presented by the Union Defendants on this point miss the mark completely.

The seminal case in addressing union liability for acquiescing in a hostile work environment under § 703(c) of Title VII in circumstances similar to the case sub judice is *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In *Goodman,* the unions argued that they could not be liable under Title VII for failure to pursue racial discrimination grievances on behalf of black union members. The facts in *Goodman* revealed that the employer was discriminating against blacks by discharging probationary employees. The facts demonstrated that the unions "were aware of [the discrimination] but refused to do anything by way of filing proffered grievances or otherwise ... and the Unions had ignored grievances based on instances of harassment which were indisputably racial in nature ..." *Goodman,* 482 U.S. at 666, 107 S.Ct. 2617. In affirming the judgment against the unions based on these facts, the Supreme Court held that:

> "A union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer, ... or in deference to the perceived desires of its [ ] membership is liable under ... Title [VII] ..."

*Id.* at 669, 107 S.Ct. 2617. *Goodman* clearly establishes that a union that "deliberate[ly] cho[oses] not to process grievances" of discrimination by the employer violates Title VII. *Id.* at 667, 107 S.Ct.

2617. The Court went on to say that the plain language of the statute supports this conclusion. *Id.* The outcome of the case turned on the fact that the unions knew of the discrimination and, thus, acted "deliberately" when they chose not to file grievances. The Court did not have to reach the more abstract question of whether the unions had an affirmative duty to ferret out and combat employer discrimination in order to meet its duty. A number of Circuit Courts have also applied the *Goodman* holding that a union violates Title VII by acquiescing in or encouraging employer discrimination if, with knowledge of the discrimination, the union deliberately chooses not to file grievances. *See Marquart v. Lodge 837,* 26 F.3d 842, 853 (8th Cir.1994) ("If the Union refused to process the sexual harassment complaints of its male and its female members, the union would still violate Title VII because a union may not encourage its employer to discriminate.") (citations omitted); *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 798 (10th Cir.), *cert. denied,* 522 U.S. 935, 118 S.Ct. 342, 139 L.Ed.2d 266 (1997) (stating that a union "cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability . . .").

The *Goodman* holding has also been vigorously applied in the context of gender discrimination. In *E.E.O.C. v. Regency Architectural Metals Corp.,* 896 F.Supp. 260, 269 (D.Conn.1995), it was held that plaintiff's Title VII claim based upon § 703(c) was governed by *Goodman,* which "applies equally to sex discrimination." The *Regency* Court found the unions liable because the local union representative intentionally failed to process plaintiff's grievances in the face of obvious sexual harassment. Despite the union official's stated reason for not processing the grievance, the "contradictory explanations for failing to help her . . . require[d the court] to look deeper for his actual motivation." *Regency,* 896 F.Supp. at 269. Similarly, in *Durko v. OI–NEG TV Products, Inc.,* 870 F.Supp. 1268, 1277 (M.D.Pa.1994), the

Court denied the union's motion for summary judgment because "the plaintiff ha[d] presented facts sufficient to call into question whether union official's [sic] failed to take action to redress a hostile work environment."

█ The Union Defendants have made a feeble response to the *Goodman* line of cases. Defendants cite *York v. American Tel. & Tel. Co.,* 95 F.3d 948, 956 (10th Cir.1996) for the proposition that mere inaction does not equal acquiescence under *Goodman. See* Union Defendants' memo. at 23. The present case is easily distinguishable from *York* since the plaintiff in that case "offered no evidence establishing . . . that [the union] knew of intentional discrimination against women by [the employer] . . ." *York,* 95 F.3d at 957. Here, plaintiff has brought forth evidence that both Almeida and Francis knew of plaintiff's harassment, and deliberately stuck their heads underneath the sand in response thereto. In light of the severe and constant harassment endured by plaintiff, of which the union was aware, it is reasonable to infer, for purposes of this motion, that the Local Union failed to file grievances because of some discriminatory motive or attitude which pervaded both the Union and plaintiff's place of work.

Finally, other cases cited by the Union Defendants are inapposite. In those cases where summary judgment was granted or the union was found not liable under the acquiescence theory, the rationale grounding the determination was that the employer was ultimately found not to have discriminated against the plaintiff or created a hostile work environment. That is not the case here. The evidence here is overwhelming that Rainey was subjected to gender discrimination and harassment at her place of work.

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether the Local Union knew of the nature and extent of the sexual harassment endured by plaintiff and, in

light of such knowledge, failed to file grievances on her behalf, for gender reasons, after she complained of the harassment. Consequently, in viewing the facts in the light most favorable to plaintiff, it is clear that the Local Union's response to plaintiff's complaints was not mere inaction, but instead rose to the level of deliberate acquiescence in the employer's gender discrimination and harassment. This is because § 703(c) of Title VII, as interpreted by *Goodman,* mandates that a union cannot tacitly encourage employer discrimination by turning a blind eye to sexual harassment which comes to light. Therefore, the Union Defendants' motion for summary judgment on Counts I and II must be denied.

**D. Liability of the International Union**

▆ Plaintiff also argues that the International Union is vicariously liable for the Local Union's failure to assert grievances on her behalf. It is well established that a parent union may be held vicariously liable for the discriminatory acts of its affiliated local union where the facts indicate that the parent and the local have an agency relationship, or where the parent international union ratifies or supports the local's discriminatory acts. *See Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1429–30 (D.C.Cir.1988), *clarified on reh.,* 852 F.2d 619 (D.C.Cir.), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989). The *Berger* Court made clear that "an agency relationship between the International and [the local union] with respect to the particular discriminatory practices in issue is both a necessary and a sufficient basis for holding the International liable . . . under Title VII . . ." *Id.* at 1430. Citing the principles from *United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), and *Carbon Fuel Co. v. United Mine Workers,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), the Court in *Berger* held that the international union may be liable for the discriminatory acts of the local union "if, with knowledge, it au-

thorizes, ratifies, or approves a local's actions the effects of which are sufficient to establish a claim of intentional discrimination against the local" or "that what was done was done by their agents in accordance with their fundamental agreement of association." *Berger,* 843 F.2d at 1427; *Abreen Corp. v. Laborers' Intern. Union, N.A., AFL-CIO,* 709 F.2d 748, 757 (1st Cir.1983) (en banc), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984).

Therefore, in a case such as this, plaintiff need only set forth evidence that either an agency relationship existed or that the International Union knowingly authorized, instigated, supported, or encouraged the discriminatory acts committed by the Local Union. In the case sub judice, plaintiff has set forth facts sufficient to preclude granting summary judgment for the International Union on both prongs of potential liability.

With respect to whether the International Union knowingly approved or encouraged the discriminatory acts of the Local Union, the International Union has only offered the statements of the International Union representative, Kennedy, and the two Local Union representatives Francis and Almeida, which indicate that Kennedy did not know of plaintiff's harassment problems. However, plaintiff has offered evidence indicating that Kennedy was present at the monthly meetings of the Local Union where grievances and other union problems were discussed, and that Kennedy was directly involved in the grievance process. For purposes of this motion, this Court can reasonably infer that if Kennedy was present at the monthly meetings then it was likely he knew of plaintiff's multiple grievances. Under the burden shifting framework of *McDonnell Douglas* discussed earlier, if the plaintiff produces any evidence which permits an inference of discriminatory intent on behalf of the defendant, then this Court cannot conclude that the plaintiff will not carry his or her burden at trial. *See Gannon*

*v. Narragansett Electric Co.*, 777 F.Supp. at 170 (denying defendants' motion for summary judgment because plaintiff had put forth sufficient facts from which the Court could infer discriminatory intent). Consequently, the critical issue of whether Kennedy knew of the grievances and sat in silence, thereby approving of the Local's action, calls into question the credibility of Kennedy, Francis and Almeida. At this point in the litigation it is not proper for this Court to determine who is telling the truth. "The plaintiff does not have to prove [her] case to the judge before [she] may present it to the jury." *Id.* The parties therefore have a genuine dispute over material facts which is for the jury to decide.

■■■■ Plaintiff has also offered evidence which precludes granting summary judgment for the International Union because of the International Union's potential vicarious liability through a theory of agency. *See Abreen*, 709 F.2d at 757 (citing *United Mine Workers*, 444 U.S. at 213, 100 S.Ct. 410). Traditional factors indicating an agency relationship include consent, fiduciary duty, absence of gain or risk to the agent, and control by the principal. *See Berger*, 843 F.2d at 1429 n. 29. Simply stated, a principal may be held liable for the intentional torts of its agent if the agent's conduct is within the scope of his agency and if, with knowledge of the conditions, the principal intends the conduct or its consequences. *Id.* at 1430.

An International Union has been held vicariously liable where the Local Union was acting as an agent of the international for purposes of negotiating or signing a discriminatory collective bargaining agreement. *See Howard v. International Molders & Allied Workers Union*, 779 F.2d 1546, 1548 (11th Cir.), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986) (international liable where its representative "worked closely" with local negotiators, resulting in discriminatory bargaining agreement); *in accord, Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 737–38

(5th Cir.1976); *see also Kaplan v. International Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1360 (9th Cir.1975) (international liable where it negotiated and signed discriminatory collective bargaining agreement). Using the same rationale, the Fifth Circuit found an international union liable for the discriminatory effects of a facially neutral collective bargaining agreement where there was a "sufficient connection" between it and the discriminatory contract. *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 850–51, *modified on other grounds*, 556 F.2d 758 (5th Cir.), *cert. denied*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). The Court concluded there that a sufficient connection existed between the international and the discriminatory practices by virtue of the "close relationship" between the international and the local. This "close relationship" was evidenced by the fact that the international provided advisors who would review and comment on the local's bargaining position during negotiation of the discriminatory contract. *Myers*, 544 F.2d at 851.

The critical inquiry here is whether the International Union's control of the Local, or extensive involvement with the Local, establishes an agency relationship with respect to the particular discriminatory practices at issue. *See Berger*, 843 F.2d at 1430. In short, was the International Union extensively involved with the Local Union's grievance procedures under the CBA in this case? In support of her contention that the International Union extensively controlled the Local Union, plaintiff cites the Constitution and By–Laws of the International Union. The International Union imposes its own Constitution and By–Laws as the Constitution of each Local Union. *See* Exhibit 1, Article I. These documents provide that members of the Local Union shall also be members of the International Union, and that the International Union has the exclusive power to transfer or merge existing locals and appoint local officers. *See id.* at Article VII,

1.4. Further, the International Union negotiates and signs the Local's contracts with employers, including the CBA at issue in this case. While it may be helpful to look to the Constitution of the International in order to establish agency, the Constitution and By–Laws cited by plaintiff may "paint a misleading picture of the actual relationship [the international] has with its locals." *Berger,* 843 F.2d at 1431. It would be a mistake for this Court to presume an agency relationship merely by reading the Constitution and By–Laws of the International. "For this reason, an agency relationship cannot simply be presumed rather than proved: 'the diverse situations possible in the varied relationship between parent and local unions make individual examination of the facts, rather than a mechanical application of assumptions, a vital necessity.'" *Id.* (citing *Sinyard,* 577 F.2d at 947). Although the Constitution and By–Laws cited by plaintiff establish a presumption of an agency relationship, the proof of the pudding is in the eating.

In addition to the terms of the Constitution and By–Laws, plaintiff has shown that Kennedy, the International's representative, was regularly and extensively involved with complaints and grievances made by the Local's members. *See* Local Union's Answers to Interrogatories, # 96. Furthermore, Francis testified in his deposition that when he had a question about either the CBA or whether a complaint was grievable, he sought the advice of Kennedy. *See* Francis depo. at 46. Consequently, plaintiff has made a prima facie showing that, in fact, there was an agency relationship between the International Union and the Local Union with respect to the discriminatory practices of the Local Union. This serves as a foundation for a finding of vicarious liability on the part of the International Union. *See Berger,* 843 F.2d at 1427; *Abreen,* 709 F.2d at 757. As stated earlier, Kennedy denies any involvement or knowledge of plaintiff's complaints. Consequently, there is a genuine dispute over material facts regarding this issue that will have to be resolved by the jury. Therefore, the International Union's motion for summary judgment on Counts I through IV is denied.

### Conclusion

For the foregoing reasons, the Union Defendants' motion for summary judgment on Counts I through IV is denied.

It is so ordered.